NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ALBRITTON ENGINEERING CORPORATION, Respondent.

No. 21064.

United States Court of Appeals Fifth Circuit.

Jan. 11, 1965.

Rehearing Denied Feb. 23, 1965.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, N. L. R. B., Margaret M. Farmer, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Melvin Pollack, Atty., N. L. R. B., for petitioner.

L. G. Clinton, Jr., H. L. Deakins, Jr., Houston, Tex. (Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel), for Albritton Engineering Corp.

Before WISDOM and GEWIN, Circuit Judges, and HANNAY, District Judge.

WISDOM, Circuit Judge:

The National Labor Relations Board petitions for enforcement of an order against Albritton Engineering Corporation. The order is based on the Board's finding that the respondent was in violation of Section 8(a) (1) and (3) of the National Labor Relations Act for refusing to rehire former "economic" strikers after the strike ended. In addition to the cease and desist provisions,

the order requires the Company to reinstate and make whole twenty-one strikers denied reemployment. We grant enforcement of the order, except as to two of the striking employees.

Albritton has two plants at Bryan, Texas. The Company makes and sells aluminum windows. In August 1959 the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers was certified as bargaining representative of the production employees at the two plants. Negotiations between Albritton and the Union limped along until June 1960, then collapsed. In late May or early June 1960, Ford D. Albritton, Jr., president of the Company, anticipating a strike, called together the workers from both plants and talked to them for about half an hour. Albritton bemoaned the fact that he and the employees would no longer be "one big happy family", and reminded them that under the Texas Right to Work law members of the Union did not have to join any strike that might be called. He promised that he would protect any employee who did not join the strike, and warned that he would replace any who did. June 13, 1960, about fifty-five of the Company's one hundred forty employees walked out. On that day Albritton made speeches at each plant to the employees who had not struck. He repeated and elaborated his earlier statements, and assured the men that the plants would stay open. Albritton announced that any striker who wanted to do so could return to work, and that any who did not return would be permanently replaced. During the first week of the strike the Company sent letters to the strikers, telling them that if they wanted to return they should report for work by 7:00 A.M., June 20. One came back. By July 25 all but two of the strikers, the Company's two most senior employees, had been replaced. July 22, the Union announced its intention to withdraw financial support from the strike. That day, deterred, the strikers stopped picketing.

Between July 25, 1960 and May 15, 1961, further jobs became available and a number of the former strikers asked the Company for reemployment. Only one succeeded. From November 14, 1960 to May 13, 1961, the respondent hired forty-six employees for jobs that the strikers were qualified to perform. May 15, 1961, the Union filed a charge alleging that Albritton had discriminatorily refused employment to twenty-one named complainants. The Trial Examiner and the Board found for the Union. 138 NLRB No. 115.

The Company was privileged to replace strikers during the strike, in the interest of keeping its business going. N.L.R.B. v. Mackay Radio & Telegraph Co., 1937, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. It was not privileged to discriminate against them when they applied for jobs later becoming available. N.L.R.B. v. Erie Resistor Corporation, 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308. To refuse to hire, or to rehire, job applicants because of their union membership or activity violates Section 8(a) (1) and (3) of the Labor Relations Act. Phelps Dodge Corporation v. N.L.R.B., 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271; N.L.R.B. v. American Compress Warehouse, Division of Frost-Whited Company, Inc., 5 Cir. 1963, 321 F.2d 547, 549.

We hold that substantial evidence on the record as a whole supports the Board's findings that nineteen of the complainants—all, that is, except Ruiz and Espinoza—applied to Albritton for reemployment and where rejected for a discriminatory motive. Not all of the nineteen filed written application forms; some inquired only by telephone. But each communicated to some responsible company official his request to be rehired, and was told either that he was not eligible, or that the Company would consider his application and let him know if there were any openings.

Two of the complainants, Ruiz and Espinoza, had not applied directly to the Company as of the time that their

charges were filed. Both were registered for employment with the Texas Employment Commission from about the time the strike ended until May 26, 1961. Espinoza tried three times, unsuccessfully, to telephone Albritton's personnel managers, Varner and Kilgore, but did not ask that his calls be returned. Ruiz made no attempt to get in touch with any company official until he applied for employment on May 15, 1961, three days after he had signed his charge of discrimination. April 10, 1961, personnel manager Kilgore told the employment commission that Albritton's standing policy of not rehiring former employees was applicable to strikers. May 2, 1961, the Company asked the commission for three employees. The commission referred seven applicants, but passed over Espinoza, Ruiz, and other strikers. Albritton hired three or four of these applicants.

■ The Examiner and the Board found that the Company was estopped from disavowing responsibility for the actions of the employment commission, and ordered Espinoza and Ruiz reinstated. The Board's reliance on estoppel seems to us misplaced. Application to the commission was not application to the Company, and there is no evidence that Espinoza or Ruiz ever thought otherwise. We must deny enforcement as to these two complainants.

As for the Company's refusal to hire the nineteen employees who did apply for jobs, the Board's finding of discriminatory motive is supported by substantial evidence, but just barely. President Albritton's speeches to the employees, before and after the strike, and a similar speech by personnel manager Varner, demonstrate the Company's anti-union animus. Taking the record as a whole and bearing in mind the Company's strong anti-union policy, the Board could reasonably conclude that the Company's repeated refusal to rehire replaced strikers despite their qualifications was due to their having participated in the strike.

In defense, Albritton attributes its refusal to rehire the strikers to its policy of never rehiring former employees. The Company contends that after a cost analysis study in 1958, it adopted this policy to eliminate "job hopping" at its plants; an employee who quits once, if rehired is likely to quit again. An interviewer at the employment commission recalled being told of the policy sometime in 1958. However, the policy was never published or communicated generally to the employees. And it was not rigidly enforced. Personnel manager Varner— who, however, was not in Albritton's employ, during the entire period between December 1960 to May 1961—admitted that seven former employees had been rehired since the policy was adopted. The Company insists that each of these employees qualified as an exception to the rule by meeting certain requirements. This explanation seems attenuated.

■■ The Board found that the Company was using the policy as an excuse for not taking back the strikers, and that its real purpose was to discourage union activity at its plants. The finding is supported not only by the admitted exceptions to the Company's rule, but also by the fact that personnel manager Varner accepted a number of written applications from former strikers, and in many instances failed to mention the Company's policy of not rehiring former employees. In fact, the first time the policy was ever mentioned to any striker was in March of 1961. A rule against job-hopping is not in itself unlawful and its adoption is a proper decision for management. But as we read the record, we cannot say that the Board's skepticism toward the Company's explanation was unwarranted. Employees who leave their jobs to join in a strike can hardly be considered unstable job-hoppers. We find that substantial evidence and fair inferences support the Board's finding that the rule was a pretext for unlawful discrimination.

■ The Company asserts several other defenses. First, the Company argues that the reason employees Currie, Gos-

sett, Stabler, Alanis, Johnson, and Hurt (and Ruiz) were not hired was that they applied for specific skilled jobs to which they were not entitled under the Company's "hire-in" policy of employing new applicants for simple jobs only. But these men could not be considered as "new" employees in any sense that accords with the policy, since they had been employed before to the satisfaction of the Company. Moreover, Hurt, Stabler, and Johnson made unqualified applications for employment. Considering these and other circumstances, we sustain the Board's finding that these applications were in fact rejected because of the Company's policy not to rehire the strikers.

■ Second, the Company argues that the order as to Alvarado, Ramirez, Faust, and Munoz is improper under Section 10(b) of the Act, because these applicants applied for work more than six months before the filing of charges in their behalf. Section 10(b) forbids issuance of a complaint based on any unfair labor practice occurring more than six months before the filing and service of the charge. The record, however, establishes that the applications of Alvarado, Ramirez, Faust, and Munoz were regarded by both the applicants and the Company as *continuing* applications. The Company's practice was to keep its applications on file for use in filling vacancies. The Personnel Manager assured the complainants that he would let them know when jobs became available; told Faust that his original application would be considered still open; told Ramirez and Munoz that he would let them know when a job became available. On these and other facts relating to this Company's practices in handling appli-

cations, we are constrained to hold that the Company committed a separate unfair labor practice each time, between November 15, 1960 and May 15, 1961, that it bypassed for discriminatory reasons the application of a former striker. Section 10(b), therefore, is not necessarily an obstacle to enforcement of the Board's order. See N.L.R.B. v. Textile Machine Works, 3 Cir. 1954, 214 F.2d 929, 932; N.L.R.B. v. Plumbers and Pipe Fitters Local Union 214, 7 Cir. 1962, 298 F.2d 427. See also Local Lodge 1424, I.A.M. v. N.L.R.B., 1960, 362 U.S. 411, 416, 80 S.Ct. 822, 4 L.Ed.2d 832.

■ Finally, the respondent contends that the complaint was improperly issued. Before any hearings were held in this case, the respondent filed a motion to dismiss the complaint. The motion alleged that the complaint violated Section 102.18 of the Board's Rules and Regulations (Series 8). 29 C.F.R. § 102.19.[1] June 26, 1961, the Regional Director refused to issue a complaint on charges filed by some of the employees. He notified the parties that an appeal might be made to the General Counsel in accordance with Section 102.19 and that upon good cause, the General Counsel might grant an extension of time in which to file an appeal. July 7 the complainants requested an extension. July 10 the Regional Director then granted an extension. An appeal was filed within the extension of time allowed. In substantial part, the appeal was granted. September 28, 1961, a complaint issued. That same day, the respondent requested the General Counsel to reconsider its decision reversing the Regional Director on the ground that the Board's Rules and Regulations do not authorize or permit the grant of an extension of time within which to file an appeal. There

---

1. Section 102.19 provides:
"*Review by the general counsel of refusal to issue.* If, after the charge has been filed, the regional director declines to issue a complaint, he shall so advise the parties in writing, accompanied by a simple statement of the procedural or other grounds. The person making the charge may obtain a review of such ac-

tion by filing a request therefor with the general counsel in Washington, D. C., and filing a copy of the request with the regional director, within 10 days from the service of the notice of such refusal by the regional director. The request shall contain a complete statement setting forth the facts and reasons upon which the request is based."

is no merit to the respondent's contention. We agree with the Eighth Circuit's holding in N.L.R.B. v. Monsanto Chemical Company, 1953, 205 F.2d 763, 764, a similar situation:

"The bald argument on behalf of respondents is that the Board is powerless in the public interest to relax the time provisions of its procedural rules in any case before it. * * *

"It is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. * * * The rule stated applies with especial force in cases before the National Labor Relations Board. The Board acts in the public interest and not in vindication of private rights. * * * "

We grant enforcement of the Board's order, except as to the reinstatement of Ruiz and Espinoza.