**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BECKHAM, INC., Respondent.**

**No. 77–1223.**

United States Court of Appeals, Fifth Circuit.

Dec. 8, 1977.

Elliott Moore, Deputy Associate, Gen. Counsel, Marion L. Griffin, Supervisor, Howard F. Fine, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Norman F. Burke, Orlando, Fla., for Beckham, Inc.

Before BROWN, Chief Judge, and RONEY and FAY, Circuit Judges.

RONEY, Circuit Judge:

The sole issue before the Court is whether substantial evidence on the record considered as a whole supports the finding of the National Labor Relations Board that respondent, Beckham, Inc., manifested an unequivocal intention to be bound by group rather than individual action in collective bargaining, so that his refusal to sign the resulting collective bargaining agreement amounted to a refusal to bargain. Although the undisputed evidence could be subject to differing inferences, the standard of review permitted this Court requires an enforcement of the Board's remedial order requiring compliance with the collective bargaining agreement negotiated by the multi-employer group's representatives.

The Board, by a two to one vote, reversed a decision of the Administrative Law Judge ("ALJ") and ruled that Beckham had violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(5) and (a)(1), by refusing to ad-

here to a collective bargaining agreement between the Central Florida Chapter, Painting and Decorating Contractors of America, Union Division (the "Association") and the International Brotherhood of Painters and Allied Trades, AFL–CIO, Local Union 1010 (the "Union").

■ On the Board's petition for enforcement, this Court's role is very limited. The legal test is clear, the facts are largely undisputed, and the only real dispute between the parties (and the difference between the ALJ and Board decisions) relates to the legal effect of what occurred. If the Board's conclusions are supported by substantial evidence on the record considered as a whole, we must grant enforcement. This is true even though the Board disagreed with the ALJ, *NLRB v. Materials Transportation Co.*, 412 F.2d 1074, 1079 (5th Cir. 1969); *NLRB v. Miami Coca-Cola Bottling Co.*, 382 F.2d 921, 923 (5th Cir. 1967), and even where the contrary conclusions of the ALJ also have substantial support in the record, *Russell-Newman Mfg. Co. v. NLRB*, 407 F.2d 247, 253 (5th Cir. 1969).

While multi-employer bargaining is not specifically mentioned in any of the labor relations acts, it has a long history in many industries. Congress, in rejecting proposals to eliminate multi-employer bargaining, has concluded that multi-employer bargaining often is "a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining." *NLRB v. Truck Drivers, Local 449 (Buffalo Linen)*, 353 U.S. 87, 95, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957), *quoted in NLRB v. Hi-Way Billboards, Inc.*, 473 F.2d 649, 652 (5th Cir. 1973). Congress intended " 'to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future.' " 353 U.S. at 96, 77 S.Ct. at 647.

■ The Board has formulated a court approved test to determine whether a multi-employer bargaining unit has been established. The test is whether the employer members of the group have indicated from the outset an unequivocal intention to be bound by group action in collective bargain-

ing, and whether the union, being informed of the delegation of bargaining authority to the group, has assented and entered into negotiations with the group representative. *See, e. g., NLRB v. Hart*, 453 F.2d 215, 217 (9th Cir. 1971), *cert. denied*, 409 U.S. 844, 93 S.Ct. 46, 34 L.Ed.2d 84 (1972); *Western States Regional Council No. 3, Int'l Woodworkers v. NLRB*, 130 U.S.App.D.C. 176, 398 F.2d 770, 773 (1968). Both parties agree with the Board that this is the appropriate legal test.

The facts upon which the Board based its findings are, in the words of the ALJ, "in large part undisputed." Prior to 1975, Beckham and other members of the Association bargained with the Union as a group, but with the purpose of signing individual contracts. Such procedure was followed in the negotiation and execution of a 3-year contract in 1972. At some point prior to 1975, the expiration date of the 1972 contract, the Association amended its bylaws to enable it to act as a multi-employer bargaining unit and negotiate a single contract for its members, although the bylaws did not specifically refer to this purpose.

At the Association's May meeting, its president, William Pass, announced that the employers would negotiate as a unit for a single contract, instead of as individual employers as they had previously done. All of the members present, including Beckham, agreed to this. Before negotiations commenced, the Association requested that its members (and several other employers who had contracts with the Union) execute an "Assignment of Bargaining Rights and Designation of Collective Bargaining Agency" form. Only three companies returned the assignment form. Beckham never signed the form. The Union, however, was never informed about the Association's request for the forms.

Negotiations commenced June 24 and ended July 28, 1975. At an early negotiating session, Pass told the Union that the Association was negotiating for all of its members as a group, instead of individually as had previously occurred. Beckham was present at this, and virtually all subsequent

negotiating sessions, and he never indicated any disagreement with Pass' statement. The Union agreed to negotiate with the Association as a multi-employer unit. While the Union was apparently uncertain as to exactly who the Association was representing, the Union clearly understood that *Beckham* was a member of the Association and would be bound by any agreement reached by the Union and the Association.

At the final negotiating session held on July 28, the employers returned from a private caucus, and reported that they agreed to the terms of the proposed contract, except that Beckham needed relief from the retroactive pay provisions. The Union was unwilling to make any exceptions in the written contract, but it did agree that it would not object if Beckham could convince his employees to waive their retroactive pay. This apparently satisfied Beckham, who said he could take care of his employees, and then all of the negotiators shook hands and announced that they had an agreement. The contract left open for future action the formation of a joint trade board and an agreement on residential rates.

The contract contained a "recognition clause," which stated that

> The Union recognizes the Association as agent for and on behalf of the companies listed under Appendix A, hereinafter referred to as the "Employer," as the primary bargaining representative for all contractors operating within the geographic jurisdiction of the Union . . .

The idea of using an Appendix to *list* who was bound by the contract had been suggested during the negotiations, and was agreed to by both sides. The Union did not request that the contract or the Appendix be signed by the employers, and the contract was signed for the Association by its president, Pass, and secretary, Turner. Pass and Turner *later* decided that it would be a good idea for Appendix A to also contain lines where the employers could sign. When Turner presented Appendix A

to Beckham for his signature, he refused to sign it. He did, however, state that he had "nothing against signing the document" and that he would do so as soon as he had completed some other discussions with the Union. At the same time, Beckham suggested that the name of another employer be removed from Appendix A, because he felt that the other employer might not sign the agreement. Beckham did not ask the Association to remove his name from Appendix A.

When Beckham later refused to sign the agreement, the Union filed an unfair labor practice charge against Beckham, which led to the filing of a complaint against Beckham by the General Counsel. The ALJ recommended dismissal of the complaint, concluding that "there was not a clear determination or announcement by [the Association] that it would bargain for certain employers as a single multi-employer unit"; that the difference between the 1975 negotiating procedures and prior procedures was not clearly established (the previous contract was negotiated by the same people who were on the Association's negotiating team, and the ALJ believed that Pass' remarks at the first session as to the change to a multi-employer unit "were not explicit"); that it was agreed at the negotiating sessions that employers who were to be parties to the contract would sign Appendix A; that various clauses in the contact showed that the Union contemplated individual employer contracts, and various other provisions had not been settled before the contract became effective; and that Beckham did not by express or implied conduct justify the Union in assuming that he was bound by the actions of the undefined multi-employer unit. By a two to one vote, the Board reversed, noting that the ALJ had taken an "unnecessarily restrictive view" of what was legally sufficient to show an unequivocal intention to be bound by multi-employer bargaining.

The Board based its decision almost entirely on the facts found by the ALJ. The Board, however, found Association president Pass' statement to the Union, that the

employers would be negotiating as a unit for a single contract, to be "clear and unequivocal." This is supported by the record. Johnson, the chief Union negotiator, testified that Pass said that the Association was representing all the employers of Union workers, and that the Union agreed to this (Transcript 34–35, 68, 121; hereafter "Tr."). Another Union negotiator, Wright, similarly testified that Pass said the employers would be negotiating as an Association (Tr. 135). The Association's secretary, Turner, testified that at one of the very first meetings, Pass told the Union that the employers were bargaining as a group (Tr. 174). Pass himself testified that "one of the first points brought up, again, in the negotiations with the Union, was the fact that [they] were bargaining as the Association, and not as individual members" (Tr. 304).

■■■ Beckham was present when Pass so informed the Union, and he did not object. He knew that the Association had been reorganized to permit multi-employer bargaining, and at the Association's May meeting he had specifically agreed to bargaining on a group basis. Beckham was a member of the Association's negotiating team, attended almost all of the negotiating sessions, and never indicated that he would not consider himself bound by the Association contract which he was helping to negotiate. At the final negotiating session on July 28, everyone, including Beckham, agreed that they had a contract. In allowing his name to be kept on the Appendix while suggesting the removal of another employer's name, he once again showed his intention to be bound by the multi-employer contract.

The result is not changed by the fact that he refused to sign the assignment of bargaining rights form. The Union was not aware of the Association's request for these forms, and it is settled that a union may rely on an employer's apparent, as well as express, delegation of authority to the multi-employer bargaining unit. See, e. g., NLRB v. Johnson Sheet Metal, Inc., 442 F.2d 1056, 1060 (10th Cir. 1971). Nor is Beckham released from his obligation by his refusal to sign Appendix A. First, while the ALJ concluded that the Union and Association negotiators had agreed that an employer was not bound until he signed the Appendix, the Board disagreed, believing that the signature lines were an afterthought, unilaterally added to the Appendix by Pass and Turner after the contract had been signed. There is substantial evidence to support the Board both in the language of the contract itself (which speaks of employers "*listed*" in Appendix A) and in the testimony of Pass (Tr. 311) and the three members of the Union negotiating team (Tr. 136, 411, 445). Thus, the signing of the contract by Pass and Turner for the Association bound all of the Association's members *listed* on Appendix A, whether or not each individual employer *signed* the Appendix. Second, even if the ALJ was correct, that would not excuse Beckham's conduct. Once an agreement has been reached, as it was here on July 28, it is an unfair labor practice for a party to refuse to sign the written contract. *NLRB v. Strong*, 393 U.S. 357, 359, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); *H. J. Heinz Co. v. NLRB*, 311 U.S. 514, 525–526, 61 S.Ct. 320, 85 L.Ed. 309 (1941).

■■■ The last area in which the Board and the ALJ differed concerned the validity of the agreement reached on July 28. The ALJ and the dissenting Board member believed that no agreement had been reached because the parties had postponed the residential rate question for separate agreement in the future. The Board ruled that a valid and binding contract had been formed on July 28. This was not a situation where the two sides had tentatively agreed on certain terms subject to resolution of other open terms. When that occurs, it is clear that there is no contract. *See, e. g., United Steelworkers of America v. Rome Industries, Inc.*, 321 F.Supp. 1170 (N.D.Ga.), *aff'd in part*, 437 F.2d 881 (5th Cir. 1970). Here, the evidence showed that the negotiators believed they had a binding agreement. As the Board stated,

The decision to put off for later decision the terms of the residential rates

effectively disposed of this last unresolved issue. By this decision, the parties signified that agreement on the contract did not hinge on agreement as to residential rates and that the contract could become effective without such an agreement. Contracting parties often table otherwise negotiable matters by agreeing to renegotiate these at some future appointed time. . . . Such understandings reflect the presence rather than the absence of consent and in no way preclude enforcement of the completed contract.

The Board, on facts very similar to those involved in the present case, reached the same conclusion in *Central Plumbing Co.*, 198 N.L.R.B. 925, 81 L.R.R.M. 1021 (1972). Similarly, in *Roadway Express, Inc. v. General Teamsters, Chauffeurs and Helpers Union, Local 249*, 330 F.2d 859, 864 (3d Cir. 1964), the union and multiemployer bargaining association had reached an agreement which provided that high standards of working conditions would be maintained, such standards to be discussed and reduced to writing at a later date. The Third Circuit recognized the contract's validity.

We understand that labor negotiators often reach agreement on a new contract (frequently under the gun of a strike deadline) by agreeing on the essential terms and agreeing to discuss other details at a future time. So long as both parties in a labor negotiation intend their agreement to be final, they may leave other issues open for future resolution without impairing the binding effect of that agreement.

The testimony before the Board could establish that on July 28 all of the negotiators, including Beckham, believed they had a final, binding agreement. In addition, Turner's testimony showed that on that date, the Union and Association had finally overcome the major stumbling block regarding residential rates, by establishing the percentage of the rates at 75%. When the parties previously had negotiated in 1972, their agreement also left open the residential rate issue for subsequent solution and incorporation by addendum to the contract. The Board's determination that the contract between the Union and the Association was valid and binding is, therefore, supported by the record.

Substantial evidence on the record as a whole supports the Board's finding that Beckham indicated an unequivocal intention to be bound by group rather than individual action. Under the law, he is thus bound by the contract negotiated by the group.

ENFORCED.

FAY, Circuit Judge, dissenting:

Although agreeing with the legal test set forth by the majority, the application of such to the evidence in this record leads me to a contrary result. As pointed out by the dissenting Board member,[1] the evidence totally negates a finding of an "unequivocal intention to participate in multiemployer bargaining" which is the very cornerstone of a ruling binding Beckham to the contract in issue. Having nothing of import to add and agreeing in toto with the aforementioned dissent, I hereby adopt it and set it forth in full.[2]

I cannot agree with my colleagues' conclusion that Respondents Beckham and McDaniel manifested an unequivocal intention to participate in multiemployer bargaining and are therefore required to abide by the contract purportedly negotiated in their behalf. My colleagues have, I am afraid, overstepped the bounds of descriptive lexicography and have wrestled unexpected new meaning from the word "unequivocal." What they find to be unequivocal I find to be fraught with ambiguity, uncertainty, and disguise.

The record shows that prior to 1975 the members of the Association bargained as a group but with the intention that each employer would sign a separate contract with the Union and be bound individually

---

1. Peter D. Walther.

2. The footnotes cited in Mr. Walther's dissenting opinion will be set forth here with the same numbers used in his opinion.

to the terms of that contract. Although the record reveals that some efforts were made before the commencement of the 1975 negotiations to convert this method of bargaining into a multiemployer bargaining arrangement, the record does not indicate that this purpose was effectively communicated either to the Association members themselves or to the Union.

Rather, we are confronted, in a significantly large number of instances, with behavior on both the Union's and Respondents' part which suggests that no departure from the old bargaining scheme was envisioned by the bargaining participants. While the record does contain evidence that group bargaining was contemplated, this evidence is not of the convincing unambiguous variety required by the Board to prove consent to a multiemployer bargaining arrangement.

Thus, although Turner testified that the Association bylaws were amended to prepare the way for multiemployer bargaining, there is no reference in the bylaws to such bargaining, nor is it shown that the Respondents were made aware of the change. Similarly, while it is established that at the May meeting a changeover to group bargaining was discussed, there is no evidence that Respondent Beckham specifically participated in this discussion or that Respondent McDaniel, who was absent from the meeting, was notified as to what had been agreed. Additionally, there is no evidence that at the first negotiating session Respondents Beckham and McDaniel heard or understood Pass' remarks indicating that bargaining would be on a multiemployer basis.

The record is populated with incidents and facts which contradict my colleagues' conclusion that multiemployer bargaining was clearly intended. As the Administrative Law Judge observed, the Union was not told which specific contractors the Association was bargaining for nor does it appear that the Union deduced the names of these contractors, as my colleagues suggest.[20] When, during the ne-

[20] This fact is borne out by Johnson's testimony that he sought the signature of individual contractors to the agreement because "I didn't have no names. I didn't know who was members, who wasn't members, or anything. . . . ."

gotiations, Respondents Beckham and McDaniel were solicited to assign their bargaining rights to the Association, both declined, McDaniel stating expressly that he was not going to give his rights to somebody else. Later, after the July 28 final negotiating session, Beckham challenged the right of Turner and Pass to sign a contract without reaching agreement on the retroactive pay and residential rate questions.

Furthermore, Pass and Turner, the instigators of the group bargaining plan, demonstrated that even they were uncertain as to whether the Association members had consented to multiemployer bargaining. Both testified that Appendix A was designed to provide for individual signatures in order to bolster each member's consent to be bound by the contract, consent which Pass admitted was at that time only implied.

Finally, the Union itself acted in a manner which suggests that it had no firm understanding that multiemployer bargaining was intended, when after the contract was drafted it sought to obtain signatures to the contract individually from the various contractors involved.

My colleagues make much of the fact that Respondents Beckham and McDaniel never communicated to the Union a desire not to be bound by the Association's bargaining and thus created the appearance of having acquiesced in a multiemployer bargaining arrangement. But upon close examination it appears that Respondents' only contributions to this creation of apparent authority were their silence at the first negotiating session and their continued appearance at the negotiating sessions.[21] I would not base

[21] McDaniel, of course, only participated in two or three bargaining sessions.

the manifestation of an unequivocal intention to be bound on so slim a reed,

especially considering the parties' past bargaining history.

Bargaining on a multiemployer basis is "rooted in consent." [22] It is for that rea-

[22] *The Evening News Association, Owner and Publisher of "The Detroit News,"* 154 NLRB 1494 (1965).

son that the Board requires that contracting parties unequivocally manifest an intention to participate in group bargaining, before it finds a multiemployer unit to be appropriate.[23] Where there is no

[23] *Council of Bagel and Bialy Bakeries and its Employer Members,* 175 NLRB 902 (1969).

prior history of multiemployer bargaining, as is the case here, the Board must insist on affirmative clear evidence of parties' consent to engage in joint bargaining in establishing this unequivocal intention. For the reasons given above, I do not find such evidence to be present.

As an additional reason for not requiring Respondents to abide by the agreement negotiated in 1975, I would find that no agreement had in fact been reached. The matter of residential rates was, contrary to what my colleagues suggest, an intrinsic and necessary part of the contract—not something without which the contract could "float on its own." It was clearly contemplated—and Beckham's protest to Pass and Turner bears this out—that until a residential rate agreement was reached the contract would not be final. Since negotiations on the residential rates were still going on at the time of the hearing, I would not require Respondents to sign what is at best an interim agreement.

In conclusion, I would adopt the decision of the Administrative Law Judge and would dismiss the complaint in its entirety.