### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### PRESTON H. HASKELL COMPANY, Respondent.

#### No. 79–1051.

United States Court of Appeals, Fifth Circuit.

April 28, 1980.

Elliott Moore, Deputy Associate, Gen. Counsel, Joseph A. Oertel, Atty., Washington, D. C., for petitioner.

Jones, Corbin & Dickinson, J. P. Jones, John F. Dickinson, Jacksonville, Fla., for respondent.

Before THORNBERRY, GEE and HATCHETT, Circuit Judges.

GEE, Circuit Judge:

This case comes before us on the petition of the National Labor Relations Board (NLRB) for enforcement of its order against respondent Preston H. Haskell Company (Haskell pursuant to section 10(e) of the National Labor Relations Act (NLRA), as amended, 29 U.S.C. § 160(e).[1] The NLRB, adopting the opinion of its administrative law judge, found that Haskell had violated sections 8(a)(1) and 8(a)(5) of the NLRA,[2] 29 U.S.C. §§ 158(a)(1) and (a)(5) by refusing to execute and apply collective bargaining agreements allegedly negotiated on its behalf by the Negotiating Committee of the Associated General Contractors of America (NGAGC) (Northeastern Florida Chapter). The Negotiating Committee is the multi-employer bargaining unit[3] of the

AGC, a trade association composed of general contractors in the Jacksonville, Florida, area construction industry. Because we find that the present action is barred by the six-month statute of limitations contained in section 10(b) of the NLRA, 29 U.S.C. § 160(b),[4] we deny enforcement of the Board's order without resolving the issue of whether Haskell did commit an unfair labor practice.

Our holding applying the section 10(b) bar can best be explained by a detailed examination of the events that underlie the filing of the unfair labor practice charges. In 1974 Haskell expressly authorized the NCAGC to bargain on its behalf with construction industry trade unions. The company executed and adhered to the resulting contract, which was to expire on April 30, 1976. In December 1975 the Northeast Florida Building & Construction Trades Council, composed of some but not all of the building trade unions in the area, notified the NCAGC that seven council-affiliated trade unions[5] whose contracts were to expire on April 30, 1976, wished to open negotiations aimed at securing a new contract. Shortly thereafter the NCAGC asked each contractor that had subscribed to the expir-

---

1. Section 10(e) of the NLRA states in relevant part:

    The Board shall have power to petition any court of appeals of the United States . . within any circuit . . . wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings . . . .

2. Section 8(a)(5) provides: "It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with a representative of his employee." Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [of the Act]."

3. Multi-employer bargaining refers to "all situations in which two or more independent employers bargain or negotiate jointly, through an agent, committee, or association, with one or more labor organizations representing employees of the several employers, with respect to wages, hours, and terms and conditions of employment." Rains, *Legal Aspects and Prob-*

*lems of Multiemployer Bargaining*, 34 B.U.L. Rev. 159, 160 (1954). *See NLRB v. Truck Drivers Local 449* (*Buffalo Linen Supply Co.*), 353 U.S. 87, 93–97, 77 S.Ct. 643, 646–648, 1 L.Ed.2d 676 (1957) (discussing role of multi-employer bargaining in national labor relations policy).

4. Section 10(b) of the NLRA provides in relevant part that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . ."

5. These were Iron Workers Local Union No. 597, Carpenters Local Union No. 627, Operating Engineers Local Union No. 673, Bricklayers & Masons Local Union No. 2, Laborer's Local Union No. 301, Plasterers & Cement Finishers Local Union No. 401, and Millwrights & Machinery Erectors Local Union No. 2411. Only the first five of these unions filed the unfair labor practices that initiated the instant proceeding. For convenience they shall be referred to in this opinion as the "charging unions."

ing 1974–76 agreement, including Haskell, either to renew its membership in the multi-employer bargaining unit by signing and returning an enclosed card authorizing the NCAGC to represent it in collective bargaining or to advise the NCAGC that the company wished to withdraw from the multi-employer bargaining unit. Haskell did not reply. Consequently, in conformity with the NCAGC's traditional treatment of signatory companies that did not expressly deny continuing bargaining authority, Haskell was automatically included in the list given the unions of companies participating in multi-employer negotiations for the 1976 contract.

As a further prelude to negotiations, the NCAGC informed its members, who were concerned over their inability to compete with nonunion employers, that it would attempt to achieve money-saving uniformity in working conditions among the various crafts [6] through identical contract terms for all of the trade unions. To this end, the NCAGC requested the Building & Construction Trades Council to engage in "common bargaining" aimed at achieving an all-union agreement on provisions susceptible to common application to the several trades and invited the Council and the building trades to send representatives to a February 6, 1976, meeting to discuss a proposed uniform contract. The "common bargaining" approach represented a change in bargaining tactics by the NCAGC. Previously it had engaged in "individual" or separate negotiations with each trade union and had not attempted to deal with all the trade unions as a group.

A series of "common bargaining" sessions began with the February 6 meeting and continued until April 6, 1976. There were a total of four formal and five or six informal bargaining meetings, at least two of which were attended by representatives of Haskell. The ultimate goal of including common provisions in all building trades contracts proved elusive, however, and many of the trades not faced with imminent expiration of their contracts eventually lost interest and ceased attending the meetings. Finally, on April 6, 1976, what proved to be the last common "bargaining" meeting broke up in acrimonious confusion. The representatives of the buildings trades departed without scheduling a date for further meetings,[7] and the NCAGC concluded that it was futile to pursue the objective of uniform contract provisions by negotiating with the unions as a group. That same day Haskell wrote the AGC and announced its immediate revocation of bargaining authority. It also sent letters to the council and to the five charging trade unions that had expiring contracts, advising them of its withdrawal from group negotiations.

A hiatus in bargaining followed the abandonment of "common negotiations." Within a few days, however, the AGC contacted the seven crafts whose contracts were to expire on April 30 and scheduled "individual" bargaining sessions with each of them. Without replying to Haskell's putative withdrawal, each of the seven unions entered into "individual" negotiations with the AGC. This "individual" bargaining culminated in agreement on separate contracts with each union by April 30. The NCAGC then notified authorizing contractors that the agreements were available for execution at its office and circulated them for signing at a general meeting. All employers listed as represented by the AGC at the beginning of contract negotiations, with the exception of Haskell,[8] executed the con-

---

6. To correct some of the competitive disadvantages suffered by union contractors in bidding against nonunion companies, the AGC sought contractual uniformity in such matters as common contract expiration dates, starting and quitting times, tool pickup and cleaning times, lunch breaks, travel pay, and the treatment of inclement weather dates.

7. Customarily, the union and employer representatives scheduled a subsequent meeting be-

fore adjourning each session, thus signalling their willingness to continue negotiations.

8. Indeed, following its April 8 withdrawal, Haskell completely terminated its relationship with the trade unions and the council. The company did not obtain help through the union hiring hall, nor did it make any contributions on behalf of employees after that date.

tracts. On October 29, 1976, five of the unions that had negotiated new contracts filed unfair labor practice charges against Haskell, alleging that the company had refused to bargain collectively with them "on or about April 30, 1976." Copies of the charges were served on Haskell by registered mail[9] on November 1, 1976.

Section 10(b) provides in relevant part that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of a charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . ." 29 U.S.C. § 160(b). Haskell contends that the timing of the recounted events establishes that the section 10(b) statute of limitations forecloses this proceeding against it. Since we find the statute of limitations argument dispositive, we do not examine Haskell's other grounds for resisting enforcement of the Board's order.[10]

Haskell asserts section 10(b) limitations on the basis of principles established in *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (*Bryan Manufacturing*). There the Supreme Court noted that section 10(b) does not bar an action "where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices." *Id.* at 416 & n. 6, 80 S.Ct. at 826 & n. 6. In this situation, relevant evidence of events outside the 10(b) period can be employed "to shed light on the true character of matters occurring within the the limitations period . . . ." *Id.* On the other hand, the Court held, the section 10(b) proviso does bar an action "where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice." *Id.* In this second situation, the use of the earlier unfair labor practice "does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful," *id.* at 417, 80 S.Ct. at 827, and in so doing impermissibly attempts to revive a legally defunct unfair labor practice.

The distinction between the situation in which section 10(b) bars an unfair labor practice proceeding and that in which legal action is allowable is well illustrated in the case law. In *Bryan Manufacturing* itself the Court ruled that section 10(b) barred an action challenging enforcement of a union security clause during the limitations period. The charges alleged that continued enforcement was illegal because the union had lacked majority status when the collective bargaining agreement containing the clause

---

**9.** Haskell states that although the charges were mailed on November 1, 1976, it did not receive them until November 3. However, Board rules and regulations, Series 8, as amended, 29 C.F.R. §§ 102.111(a) and 102.113(a), provide that "[c]harges . . . may be served . . . by registered mail" and that "[t]he date of service shall be the day when the matter served is deposited in the United States Mail." Therefore, for purposes of § 10(b), Haskell was served on the mailing date.

**10.** Haskell urges that undisputed facts demonstrate that it never manifested the "unequivocal intent" to be represented by the AGC necessary for it to be held a member of the multi-employer bargaining unit and bound by the group's acceptance of the collective bargaining agreement. *See McAx Sign Co. v. NLRB*, 576 F.2d 62, 66 (5th Cir. 1978); *NLRB v. Beckham, Inc.*, 564 F.2d 190, 195 (5th Cir. 1977). Additionally, it maintains that even if the evidence could support a finding that it was initially a member of the AGC bargaining unit, the evidence also confirms that its April 8 withdrawal was justified either by an impasse in negotiations, *see NLRB v. Hi-Way Billboards, Inc.*, 473 F.2d 649, 654 (5th Cir. 1973), or by implied consent, *id.* at 652, such that it was not obligated to execute and implement the contract terms accepted after its withdrawal.

Haskell finally argues that consideration during common bargaining of a proposed contract provision that would have established a union fund with employer contributions, in possible violation of § 302(a) of the NLRA, 29 U.S.C. § 186(a), represented an "unusual circumstance" excusing its withdrawal. *See id.* at 652. However, substantial evidence supports the Board's finding that Haskell's reliance on this rationale for withdrawal was merely pretextual. At the time Haskell withdrew, the NCAGC itself opposed the fund as illegal, and adoption of the provision was not imminent.

was first adopted.[11] However, the charges initiating the legal action had been filed 10 and 12 months after the collective bargaining agreement had been executed. The Court reasoned that enforcement of the union security clause was by itself permissible and could be deemed an unfair labor practice only if the union had not represented a majority of the employees covered by it at the time the collective bargaining agreement was instituted. The Court concluded, however, that section 10(b) clearly prevented adjudicating the validity of the initial adoption of the union security clause. Therefore, the case fell within the category of actions not maintainable under the section 10(b) proviso because "the entire foundation of the unfair labor practice charge was the union's time-barred lack of majority status when the original collective bargaining agreement was signed." 362 U.S. at 417, 80 S.Ct. at 827.

This court has applied the *Bryan Manufacturing* rule to hold that section 10(b) forecloses a challenge to the continued enforcement of a collective bargaining contract provision that granted shop stewards superseniority not only for layoff and recall but also for all other terms and conditions of employment. *NLRB v. Auto Warehousers, Inc.*, 571 F.2d 860 (5th Cir. 1978). According shop stewards superseniority for

purposes other than layoff and recall preference violates the NLRA unless at the time the superseniority clause is enforced it is justified by business necessity. *Id.* at 862. In *Auto Warehousers* the superseniority clause had been enforced within six months of the filing of the unfair labor practice charge when the steward used his superseniority to rebid for his job. However, execution of the labor contract, the award of superseniority to the shop steward, and the steward's first use of his superseniority status to obtain a preferred position all took place outside the section 10(b) period. Because the enforcement of the clause could be found to be illegal only if the initial grant of superseniority also violated the Act, any finding that an unfair labor practice took place within the section 10(b) period would necessarily rest on a determination of the validity of events predating that period. Consequently, the action was barred under the section 10(b) proviso.[12]

By contrast, this court has held that section 10(b) does not bar legal action when an employer *repeatedly* refuses to bargain and a complaint is filed within six months of one such refusal, notwithstanding the fact that more than six months passed between the earlier refusals to bargain and the filing of the charge.[13] *J. Ray McDermott & Co. v.*

---

**11.** It was undisputed that an unfair labor practice *is committed when an employer and a* labor organization enter into a collective bargaining agreement containing a union security clause if, at the time of original execution, the union does not represent a majority of the employees in the unit. Maintaining such an agreement is a continuing violation of the Act.

**12.** Our discussion in *Auto Warehousers* *suggested two additional examples of the section* 10(b) time bar. We noted that when an unfair labor practice charge is based on an employer's refusal to rehire an employee who is allegedly discriminatorily discharged from employment, the action would not be allowed if the alleged discriminatory discharge occurred more than six months before the charge was filed, even though the refusal to rehire took place within *the limitations period. This result followed, we* reasoned, because the refusal to rehire could not be illegal absent illegality of the initial discharge. 571 F.2d at 865. We also observed that section 10(b) would prevent picketing em-

ployees who claimed protection as unfair labor *practice strikers from relying on alleged illegal* company conduct outside the limitations period to establish their sanctioned status where no charge based on the earlier company violations had been filed within six months of their occurrence. *Id.*

**13.** Other circuits, however, have reached the opposite conclusion, ruling that the section 10(b) *period starts to run with respect to a* whole series of refusals to bargain by an employer from the first such refusal. *See, e. g.,* *NLRB v. Serv-All Co.*, 491 F.2d 1273, 1275 (10th Cir. 1974) (following *Field & Sons* and *McCready, infra* ); *NLRB v. McCready & Sons, Inc.*, 482 F.2d 872, 875 (6th Cir. 1973) (section 10(b) statute of limitations period commenced with employer's first refusal to execute multi-employer bargaining unit contract and barred proceedings brought on charges filed within six months of subsequent refusal); *NLRB v. Field & Sons, Inc.*, 462 F.2d 748, 750–55 (1st Cir. 1972) (distinguishing employer's repeated re-

*NLRB*, 571 F.2d 850, 858 (5th Cir. 1978); *NLRB v. Louisiana Bunkers, Inc.*, 409 F.2d 1295, 1299–1300 (5th Cir. 1969); *NLRB v. White Construction Engineering Co.*, 204 F.2d 950, 952–53 (5th Cir. 1953). *Accord, NLRB v. Strong*, 386 F.2d 929, 930–31 (9th Cir. 1968), *rev'd on other grounds*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); *NLRB v. Basic Wire Products, Inc.*, 516 F.2d 261, 267–68 (6th Cir. 1975). Each refusal to bargain represents an independent unfair labor practice that does not derive its illegal character from earlier violations and, as long as one discrete violation occurred within six months of the filing of charges, legal action is timely.

In like vein, we held in *NLRB v. Albritton Engineering Corp.*, 340 F.2d 281, 285 (5th Cir. 1965), that section 10(b) did not bar an unfair labor practice action challenging an employer's refusal to rehire former economic strikers because of their union activities. The *Albritton* charge had been filed within six months of the company's latest refusal to hire its former employees but more than six months after it first

discriminatorily refused to hire them. We found that "the Company committed a separate unfair labor practice each time . . . it bypassed . . . the application of a former striker for impermissible reasons," *id.* and concluded that section 10(b) was not an obstacle. *See NLRB v. Colonial Press, Inc.*, 509 F.2d 850, 854 (8th Cir. 1975); *NLRB v. Ritchie Manufacturing Co.*, 354 F.2d 90, 99–101 (8th Cir. 1966).

Application of the bifurcated section 10(b) rule to the present case makes clear that Haskell's failure to execute the collective bargaining agreements on or after April 30, 1976, standing alone, was wholly innocent. This conduct, which occurred within the limitations period,[14] can be ruled an unfair labor practice only if it is first determined that Haskell was a member of the AGC multi-employer bargaining unit for the 1976 contract negotiations and that the company's putative withdrawal from group bargaining, which transpired outside the section 10(b) time limits, was itself an unfair labor practice that was ineffective[15] in relieving Haskell of its duty as an AGC

---

fusal to execute a contract negotiated by its multi-employer bargaining unit from a breach of the general duty to bargain on the ground that the former is a failure to perform a particular act, i. e., signing the contract, while the latter is a violation of a continuing obligation to bargain, and holding that section 10(b) barred unfair labor practice proceeding when charge was filed more than six months after the employer's first refusal to execute contract).

14. The union's October 29, 1976, filing of unfair labor practice charges and the service of the charges by mail on November 1, 1976, occurred within six months of Haskell's failure to sign the collective bargaining agreements negotiated by the AGC and the individual trade unions. The NLRB's rules and regulations, 29 C.F.R. § 102.114(a), stipulate that

[i]n computing any period of time prescribed or allowed by these rules, the day of the act, event or default after which the designated period of time begins to run is not to be included. The last day of the period so computed is to be included, unless it is a Sunday or legal holiday, in which event, the period runs until the end of the next day which is neither a Sunday nor a legal holiday.

*See* Environmental Control Systems, 190 N.L.R.B. 594 n.2 (1971). Six months from May 1, 1976, the day on which the section 10(b) period began, lapsed on Sunday, October 31, 1976. Under the applicable NLRB rule, the period

therefore extended to the following day, Monday, November 1, 1976, making the service of charges by mail, as well as the union's filing of the charges, timely.

15. The present case cannot be cast to avoid the Section 10(b) time bar by distinguishing the issue of whether, as a matter of fact, Haskell effectively withdrew from the multiemployer bargaining unit from the question of whether such conduct, standing alone, was an unfair labor practice. In *Bryan Manufacturing*, 362 U.S. at 424–25, 80 S.Ct. at 830–31, an argument was made that Section 10(b) allowed the NLRB and the courts to consider the mere existence of the facts surrounding the pre-limitation period execution of the contract, provided that those facts were not made the basis of a formal finding that the execution of the labor agreement constituted an unfair labor practice. The Court firmly rejected the effort to isolate, as a matter of fact alone, the issue of whether execution of the contract was invalid, without ascribing any legal significance to such invalidity. The Court observed that if it examined the contract in that fashion, without formally "finding" that execution of the agreement constituted an unfair labor practice, it would nevertheless remain "manifest that were . . . [the agreement's illegality] not in fact the case enforcement of the agreement would carry no taint of illegality. The availability of the repose

member to implement the labor contracts. Since a complaint based upon the allegedly unlawful withdrawal was barred by limitations, that event cannot serve to infuse with illegality Haskell's otherwise permissible refusal to sign contracts that it did not itself negotiate. The present action is thus barred by section 10(b).

Our strict adherence to the section 10(b) limitation is mandated by authoritative precedent and by the legislative purpose of barring litigation over past events " 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused.' " *Bryan Manufacturing*, 362 U.S. at 419, 80 S.Ct. at 828 (quoting H.R. Rep.No. 245, 80th Cong., 1st Sess. 40 (1947)). *See NLRB v. Auto Warehousers, Inc.*, 571 F.2d at 863; *NLRB v. McCready & Sons, Inc.*, 482 F.2d at 872. It is also dictated by the NLRA's goal of stabilizing existing bargaining relationships by allowing parties, after the time prescribed as reasonable, to assess with relative certainty their obligations to each other. *Bryan Manufacturing, supra* 362 U.S. at 419, 80 S.Ct. at 828; *Auto Warehousers, supra* at 863. Moreover, faithful application of the section 10(b) bar does not work undue hardship on the union. When the employer unequivocally withdrew from the multi-employer bargaining unit on April 8, 1976, the lines of battle were clearly drawn. It is not unreasonable to require the union to file unfair labor practice charges within six months of that allegedly unlawful act in order to later challenge that act and other resultingly illegal conduct by the employer.

ENFORCEMENT DENIED.

THORNBERRY, Circuit Judge, concurring:

I concur in the result of Judge Gee's opinion. But with deference I cannot agree

with the reason given for denying enforcement of the Board's order against Haskell. In my opinion, this case cannot be decided on the statute of limitations issue. We must decide whether Haskell committed an unfair labor practice on April 30, 1976, when it refused to execute and apply collective bargaining agreements allegedly negotiated on its behalf by the Negotiating Committee of the Associated General Contractors of America (AGC).

Section 10(b) of the National Labor Relations Act provides in pertinent part that whenever a person is charged with engaging in an unfair labor practice, the Board must serve a complaint on that person stating the charges and containing a notice of hearing, but no complaint may be issued based on an unfair labor practice later then six months after the filing of a charge with the Board. 29 U.S.C. § 160(b). In this case the charge was filed by five unions on October 29, 1976, and was served on Haskell on November 1, 1976. Therefore, the unfair labor practice must have occurred sometime between April 29, 1976, and October 29, 1976, or a claim based on the alleged unfair labor practice will be barred by the six month statute of limitations.

Judge Gee relies on *Bryan Manufacturing* and contends that the alleged unfair labor practice occurred before April 29, 1976. I find myself unable to agree with this conclusion.

The N.L.R.B. found that Haskell violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), 158(a)(5), by refusing to execute collective bargaining agreements allegedly negotiated on its behalf. Section 8(a)(5) provides that an employer commits an unfair labor practice when he refuses to bargain collectively

---

sought to be assured by § 10(b) cannot turn on the vagaries of any such hypertechnical distinctions, bearing no relation to the purpose of the legislation." *Id.* at 425, 80 S.Ct. at 831. Similarly, the policy embodied in Section 10(b) would be impermissibly sacrificed to semantic formalism were we to hold that the only relevant issue involving conduct outside the Sec-

tion 10(b) period was the purely factual question of whether Haskell did or did not effectively withdraw from the NCAGC, when all the circumstances involved in this determination occurred outside the limitations period and the same considerations involved in finding the withdrawal ineffective would also establish that such conduct was an unfair labor practice.

with the representatives of his employees. A refusal to bargain collectively includes a refusal to execute a collective bargaining agreement that was actually negotiated on a party's behalf. *Cf. Standard Oil Co. v. National Labor Relations Board*, 322 F.2d 40 (6th Cir. 1963); *Benda v. Grand Lodge of Int'l Ass'n of Machinists and Aerospace Workers*, 442 F.Supp. 431 (N.D.Col.1977), *aff'd in part, rev'd in part on other grounds*, 584 F.2d 308 (9th Cir. 1978). Therefore, the facts, as alleged by the N.L.R.B., indicate that if Haskell committed an unfair labor practice, it was committed on April 30, 1976, when Haskell refused to sign the contract, thus satisfying the six month statute of limitations.

Consistent with *Bryan Manufacturing*, the events of April 6, 1978 (the last common bargaining meeting ended in confusion) and April 8, 1976 (Haskell attempted to withdraw from negotiations) merely constituted relevant evidence of events occurring outside the six month period that "shed light on the true character of [events] occurring within the limitations period . . . ." *Bryan Manufacturing*, 362 U.S. at 416, 80 S.Ct. at 826. Haskell's actions constituted a separate refusal to execute a collective bargaining agreement and the claim is therefore not barred by the statute of limitations. *See J. Ray McDermott & Co. v. National Labor Relations Board*, 571 F.2d 850 (5th Cir. 1978).

I do, however, agree with Judge Gee that enforcement of the N.L.R.B.'s order against Haskell must be denied. I reach this conclusion, however, based on the merits of the case. The facts as stated in Judge Gee's opinion fairly and satisfactorily present an accurate description of the events leading up to the alleged unfair labor practice. Based on an examination of these facts, I must conclude that there is not substantial evidence to support the N.L.R.B.'s conclusion.

The issue stated in this case is whether Haskell was bound by the actions of the multi-employer bargaining unit or whether it made a timely withdrawal from the negotiations with the trade unions. It is clear that if Haskell was a member of a multi-employer bargaining unit with authority to negotiate on its behalf, Haskell would be deemed to have negotiated the contract itself and would be required to execute and abide by the contract. *N. L. R. B. v. Strong Roofing and Insulating Co.*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969). But I find that Haskell's withdrawal was timely.

This court stated the test necessary to determine whether a multi-employer unit has been established in *N. L. R. B. v. Beckham*, 564 F.2d 190 (5th Cir. 1977). The factors examined are:

> . . . whether the employer members of the group have indicated from the outset an unequivocal intention to be bound by group action in collective bargaining, and whether the union, being informed of the delegation of bargaining authority to the group, has assented and entered into negotiations with the group representative.

564 F.2d at 192. The "unequivocal intention to be bound by group action in collective bargaining" may be found despite the absence of an express statement made by a group of employers that they would negotiate as a single unit. *McAx Sign Company v. N. L. R. B.*, 576 F.2d 62 (5th Cir. 1978). In *McAx Sign*, we noted that:

> . . . a multi-employer bargaining unit may be established *either* by "a controlling history of collective bargaining on such basis, *or* an unequivocal agreement of the parties to bind themselves to a course of group bargaining in the future." *Electric Theatre, Inc.* 156 NLRB 1351, 1352 (1966) (emphasis added). See also *Bennett Stone Co.*, 139 NLRB 1422 (1962). Thus, the absence of a clear expression of intent in this case is no bar to a finding that a multi-employer bargaining unit existed.

*Id.* at 66, n.3. It is obvious after an examination of the facts that Haskell did not indicate directly or expressly an unequivocal agreement to be bound to a course of group bargaining in the future. The question is whether the facts reveal a "controlling history of collective bargaining *on such basis.*" *Id.* (emphasis added).

In *McAx Sign*, the employer engaged in three collective bargaining sessions, between the union and all the neon electrical sign companies of Dallas, that culminated in the execution of collective bargaining agreements. The three agreements covered the period from June 20, 1968 to June 30, 1976. The contract was to continue on a year-to-year basis unless one of the parties gave written notice of its desire to modify or terminate the agreement. Notice was given in 1976, and three of the neon electrical sign companies, including McAx, entered negotiations with the union.

McAx's representative was unable to attend the seventh negotiating meeting and attempted to avoid the matters agreed to at that time. This court denied its claim declaring that McAx was bound by the negotiations of the multi-employer unit because of the controlling history of collective bargaining on a multi-employer unit basis and because McAx agreed to bind itself to a course of group bargaining.

This case, it seems to me, is clearly distinguishable from *McAx Sign*. First, the only indication of multi-employer bargaining was based on the fact that AGC had negotiated on Haskell's behalf during the previous 1974 negotiations. This one incident cannot be said to constitute a "controlling history" of bargaining on a multi-employer basis, especially when compared to the three agreements spanning eight years found in *McAx Sign*. Second, the controlling history of collective bargaining must indicate a desire to bargain on "*such basis*." If anything, the 1974 agreement might have indicated a controlling history to enter into "one-on-one" group bargaining. It certainly did not signify a controlling history for "common" group bargaining. The "common" contract negotiations were something new that were tried for the first time in 1976. Prior to this, the contractors had only agreed to "one-on-one" group bargaining. Since the AGC was in a new bargaining area, it did not possess negotiating authority for Haskell.

Therefore, the next question is whether Haskell's withdrawal from negotiations was timely. The decision on this issue is based on the test stated by the Board in Retail Associates, Inc., 42 LRRM 1119 (1958) as follows:

> . . . the intention by a party to withdraw must be unequivocal and exercised at an appropriate time.
>
> \*    \*    \*    \*    \*    \*
>
> [The Board] refuse[s] to permit the withdrawal of an employer or a union from a duly established multi-employer bargaining unit, except upon adequate written notice given prior to the date set by the contract for modification, or to the agreed-upon date to begin the multi-employer negotiations. Where actual bargaining negotiations based on the existing multi-employer unit have begun, [the Board] would not permit, except on mutual consent, an abandonment of the unit upon which each side has committed itself to the other, absent unusual circumstances.

*Id.* at 1121. In this case, AGC had no authority to negotiate for Haskell using "common" group bargaining. Also, any authority acquired in 1974 ended on April 8, 1976, when Haskell withdrew from the negotiations. Since multi-employer negotiations using the "one-on-one" method had not yet begun, Haskell's withdrawal was timely.

In summary, Haskell's timely withdrawal from negotiations means that it did not commit an unfair labor practice when it refused to execute the agreement on April 30, 1976. Therefore I would deny enforcement of the N.L.R.B.'s order against Haskell, and I concur only in the result reached by Judge Gee.

HATCHETT, Circuit Judge, dissenting.

I concur with Judge Thornberry that this case cannot be decided on the statute of limitations issue.

I dissent, however, because I do not find that enforcement is barred by the six-month statute of limitations contained in § 10(b) of the NLRA, 29 U.S.C. § 160(b). I believe that Judge Gee's opinion misapplies

*Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), (hereinafter *Bryan Manufacturing*), and erroneously rejects the NLRB determination that the failure to execute a contract was an unfair labor practice.

*Bryan Manufacturing* says that any act, itself an unfair labor practice, occurring within the six-month limitations period, may use relevant evidence outside the six-month period. If, however, the act within the six-month period is not an unfair labor practice, it may not use unfair labor practices that occurred outside the limitations period.

In this instance, the NLRB, in affirming the conclusions of the administrative law judge, found Haskell's failure to execute on the 30th of April an independent unfair labor practice. The NLRB found that all elements of the § 8(a)(5) violation—that the negotiating committee and the charging union reached contract terms and that Haskell refused to sign the contracts—occurred on or after the 30th of April within the § 10(b) period.

Because the NLRB found the 30th of April failure to execute an unfair labor practice, under *Bryan Manufacturing*, reliance on earlier events, whether unfair labor practices or not, is permissible, since the earlier events are merely evidentiary.

Thus, Judge Gee's conclusion contradicts *Bryan Manufacturing*. The opinion presents no persuasive evidence as to why the NLRB's conclusion should be rejected.

Even assuming that Haskell's failure to execute on the 30th of April is not an unfair labor practice, in and of itself, the opinion wrongly applies *Bryan Manufacturing*.

It concludes:

Application of the bifurcated § 10(b) rule [*Bryan Manufacturing*] to the present case makes clear that Haskell's failure to execute the collective bargaining agreements on or after April 30, 1976, standing alone, was wholly innocent. This conduct which occurred, within the limitations period, can be ruled an *unfair labor practice only if it is first determined that Haskell*

*was a member of the AGC multi-employer bargaining unit for the 1976 contract negotiations and that the company's putative withdrawal from group bargaining, which transpired outside the § 10(b) time limits, was itself an unfair labor practice that was ineffective in relieving Haskell of its duty as an AGC member to implement the labor contracts.* (Emphasis added)

This conclusion, ostensibly buttressed by a sound analysis of *Bryan Manufacturing*, is incorrect, because, here, there is no reliance on earlier unfair labor practices. Neither of the two factors, Haskell's membership in the AGC and the withdrawal, deemed necessary to transform Haskell's "wholly innocent" failure to execute into an unfair labor practice, are, in and of themselves, unfair labor practices.

The NLRB stated in its decision and order that an untimely withdrawal from multi-employer bargaining may not, in and of itself, constitute a violation of the Act. The administrative law judge determined that Haskell's withdrawal was a legal nullity ineffectual to relieve Haskell from any agreement ultimately reached.

Therefore, the two factors, Haskell's membership in AGC and the withdrawal, are merely evidentiary. These two factors do not serve "to cloak with illegality that which was otherwise lawful." 362 U.S. at 417, 80 S.Ct. at 827.

Under this analysis, Haskell's 30th of April failure to execute is transformed into an unfair labor practice by reference to "merely evidentiary" occurrences. The 30th of April failure to execute does not violate *Bryan Manufacturing*, because it does not derive its illegal character from earlier unfair labor practices.

Again, to hold as Judge Gee does, he must clearly state that the finding by the administrative law judge is wrong and that Haskell's withdrawal was an unfair labor practice outside the § 10(b) limitation. Otherwise, *Bryan Manufacturing* is violated.

I agree with the NLRB's decision that Haskell's failure to execute and comply on the 30th of April or thereafter constituted an unfair labor practice within the meaning of § 8(a)(5) and (1) of the Act.

This view is valid under either the theory articulated by the administrative law judge in his decision and order or under the theory that Haskell was under a § 8(d) duty to sign some contract, sometime, and was correctly charged by the five unions with an unfair labor practice on the 30th of April. I find the latter theory preferable.

Regardless of the theory chosen, I do not see how enforcement action is barred by the six-month statute of limitations contained in § 10(b) of the Act.

I believe appellate courts should acquiesce to the specialized expertise of the NLRB and its administrative law judges, unless the weight of the evidence disputes their findings.