### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### IMPERIAL HOUSE CONDOMINIUM, INC., Respondent.

#### No. 86–5756.

United States Court of Appeals, Eleventh Circuit.

Nov. 6, 1987.

---

Elliot Moore, Deputy Associate Gen. Counsel, Peter Winkler, Patrick Szymanski, N.L.R.B., Washington, D.C., for petitioner.

Richard I. Manas, Manas & Marcus, P.A., Miami, Fla., for respondent.

Before JOHNSON and EDMONDSON, Circuit Judges, and HOFFMAN *, Senior District Judge.

EDMONDSON, Circuit Judge:

This case is before the Court on the application of the National Labor Relations Board ("the Board") for enforcement of an order issued by the Board requiring Respondent, Imperial House Condominium, Inc. ("Respondent" or "the Condominium") to cease and desist from engaging in unfair labor practices and requiring Respondent to bargain in good faith with its employees regarding terms and conditions of employment. In defense of its actions, the Condominium makes three arguments: first, the Board's decision and order is not final because the Board wrongfully denied Respon-

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

dent's motion for reconsideration; second, the Board wrongfully asserted jurisdiction over the Condominium; third, assuming the previous issues are resolved against the Condominium, the Board's decision to issue an order is not supported by substantial evidence. For the reasons set forth below, we are unpersuaded by these arguments. Accordingly, we will enforce the Board's order.

Imperial House Condominium is a residential condominium consisting of 126 apartment units, 7 domestic units, 42 cabana units and 10 boat slip units. Each unit is owned in fee simple with an undivided interest in the building's common areas, such as elevators and hallways. Unit owners are members of the condominium association which is organized as a nonprofit corporation under Florida law. The association membership elects, from its members, a board of directors responsible for the condominium's management. For example, the board of directors has authority to make necessary contracts, to hire employees, and to assess fees from the unit-owner members for condominium maintenance, taxes and insurance.

During 1980, the year in which the NLRB first asserted jurisdiction in this case, the condominium association's gross annual income was $800,386.00, derived almost exclusively from the assessment of fees. Its expenditures totaled $882,751.00, which included the purchase of utilities from Peoples Gas System in the sum of $39,427.00; Florida Power and Light, $189,790.00; and Southern Bell Telephone Co., $10,476.00. Also, $168,050.00 was paid to various companies for maintenance, repair, and supplies, including $8,480.62 to Otis Elevator. The Condominium spent $26,339.00 for insurance, including $2,074.23 to the Equitable Insurance Co. The parties stipulated that Peoples Gas System, Florida Power and Light, Southern Bell, Ohio Elevator and Equitable Insurance Co. are engaged in interstate commerce. *Imperial House Condominium, Inc.*, 279 NLRB No. 154, 122 LRRM 1289 (1986). The Condominium's payroll-related expenditures, including salaries and wages, social security and unemployment taxes, health and wel-

fare fund payments, and worker's compensation insurance payments amounted to $345,982.00.

Before it was converted into condominiums in March of 1973, Imperial House was operated as an apartment complex. During this period, its employees were represented by the Hotel Employees Local 255. Since the conversion, the employees have continued to be represented by various bargaining agents—the most recent of which is the Hotel Employees Local 355 (the "Union"). The Union's bargaining unit consists of housekeepers, elevator operators, doormen, parking attendants, maintenance personnel and all other employees except those classified as "executives, department heads, managerial employees, guards and supervisors as defined in the [National Labor Relations] Act."

On June 30, 1979, the last effective collective bargaining agreement between the Condominium and Local 355 expired. Prior to this date, Union officials had contacted the Condominium's board of directors to schedule negotiations for a new agreement; but it was not until August 17, 1979, that the first and only bargaining session occurred. Afterwards, several meeting were scheduled; but the parties did not meet again until October 10, 1980, when the Condominium withdrew recognition of the Union.

Nevertheless, between August 17, 1979 and October 10, 1980, the Condominium continued to comply with the expired agreement and, in particular, continued to make the required monthly payments to the Hotel Employees Insurance Fund (HEIF). In mid-August of 1979, the Condominium received a letter from Local 355 concerning the HEIF. The letter stated that as a result of the fund trustees' actions, "the Union and most of the principal hotels and restaurants have formed a new Trust Fund to provide medical and dental benefits." The letter then instructed the Condominium to make no further payments to HEIF, but to make future checks payable to the new Hotel Industry Pension Fund instead. On August 29, 1979, the Condominium informed the union that it

would make no contributions to either fund. Rather, the Condominium would implement its own plan that provided a higher level of benefits than those provided under the old fund.

On October 10, 1980, the last face-to-face meeting took place between the Condominium board of directors and the Union. At this time, the Condominium refused to bargain with the Union; the Condominium claimed it doubted whether the Union still represented a majority of the employees. This claim was precipitated by the fact that several employees—expressing dissatisfaction with the representation the Union was providing—had recently resigned from the Union.

Thereafter, the Union filed an unfair labor practice charge. A complaint was issued, and an Administrative Law Judge (ALJ) rendered a decision against the Condominium on December 28, 1981. An appeal to the Board was taken; and the case remained under consideration by the Board from January 28, 1982, until May 30, 1986, when the Board issued a cease and desist order by substantially adopting the ALJ's earlier decision. On June 2, 1986, this order was mailed "Return Receipt Requested" to the Condominium. A motion for reconsideration was sent by the Condominium by courier to the Board on Saturday, June 28, and was received on Monday, June 30, 1986. On July 3, 1986, the Board's Executive Secretary, citing then effective 29 C.F.R. sec. 102.48(d)(2) (1985),[1] rejected the motion for reconsideration because it was untimely submitted. The Board, on September 8, 1986, sought enforcement of its order by this Court.

## I. *The Board's Decision Was a Final Order.*

■  Initially, we must determine whether the Board's order is final. If so, then the Board's application for enforcement is properly before us, pursuant to the 29 U.S.C. sec. 160(e). *See American Fed'n of Labor v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940) (only final orders of the Board are subject to review by the Courts). If, however, the order is not final, this court is without jurisdiction. This determination hinges upon whether the Condominium filed timely exceptions to the Board's order. We conclude that the Board's decision is final because the Condominium's motion for reconsideration was too late.

When the Board rendered its order against Imperial House Condominium, Inc. on March 30, 1986, the Board's procedures required that all post-decision motions be filed within twenty days of service of the Board's order, otherwise, they were deemed to have been waived. *See* 29 C.F.R. secs. 102.48(a), (d)(2).[2] The regulations also provided that, "[t]he date of service shall be the day when the matter served is deposited in the United States mail...." 29 C.F.R. sec. 102.113(a) (1985). Where service was perfected by mail an additional three days are added to the twenty-day period in which a party is required to file objections or exceptions. 29 C.F.R. sec. 102.114 (1985).

---

1. The regulation in effect at the time the Condominium submitted its motion to reconsider was 29 C.F.R. sec. 102.48(d)(2) which provides:

   (2) Any motion pursuant to this subsection shall be filed within 20 days, or such further period as the Board may allow, after the service of its decision or order, except that a motion for leave to adduce additional evidence shall be filed promptly upon discovery of such evidence.

2. The regulations in effect at the time this controversy arose provided:

   Sec. 102.48 Action of the Board upon expiration of time to file exceptions to the administrative law judge's decision; decisions by the Board's extraordinary postdecisional motions.
   (a) In the event no timely or proper exceptions are filed as herein provided, the findings, conclusions, and recommendations of the administrative law judge as contained in his decision shall, pursuant to section 10(c) of the Act, automatically become the decision and order of the Board and become its findings, conclusions, and order, and all objections and exceptions thereto shall be deemed waived for all purposes.

   ....

   (d)(2) Any motion pursuant to this subsection shall be filed within 20 days, or such further period as the Board may allow, after the service of its decision or order, except that a motion for leave to adduce additional evidence shall be filed promptly upon discovery of such evidence.

▮ The regulatory language is clear and unequivocal. A copy of the Board's decision and order was deposited with the United States Postal Service on June 2, 1986.[3] This means that the Condominium had twenty-three days or until June 25 in which to file its motion. The motion for reconsideration was sent by courier to the Board on June 28, 1986, a Saturday, and received by the Board on Monday, June 30, 1986. As such, the Board's Executive Secretary properly rejected Respondent's motion and declined to submit it to the Board because it was untimely.[4] Our conclusion is consistent with *NLRB v. Preston H. Haskell Co.*, 616 F.2d 136 (5th Cir.1980),[5] in which charges filed by NLRB pursuant to 29 C.F.R. sec. 102.113(a) were determined to have been "served on the mailing date" even though they had been sent by registered mail. *Id.* at 139 & n. 9. *See generally NLRB v. Local 264, Laborers' International Union of North America*, 529 F.2d 778, 781–85 (8th Cir.1976) (determining that NLRB rule prescribing date of mailing as date of service is a valid and reasonable exercise of Board's authority). Thus, the Board's order is final for appeal purposes.

## II. *The Board Properly Asserted Jurisdiction over Imperial House Condominium, Inc.*

The Condominium submits that it is not an employer engaged in commerce within the meaning of sections 2(6) and (7) of the Act, 29 U.S.C. secs. 152(6), (7) (1984).[6] Accordingly, the Condominium contends that its activities are beyond the scope of the

**3.** These documents were mailed "Return Receipt Requested." The Condominium contends the existence of regulations providing that a "Return Receipt" is proof of service, *see* 29 C.F.R. sec. 102.112, demonstrates that service was not effective until the Board's order was received on June 9, 1986. This contention is inconsistent with the usual rule in federal practice. For example, both Fed.Rule Civ.Proc. 5(b) and Fed.Rule App.Proc. 25(c) provide that service is complete on mailing. In addition, "Congress has incorporated this rule into various statutory schemes.... [and] a number of administrative agencies have adopted rules which specify that the date of mailing will constitute the date of service." *NLRB v. Local 264, Labors' International Union of North America*, 529 F.2d 778, 784 (8th Cir.1976) (citation and footnote omitted). There is no contention in this case that service was simply not made. The Condominium's reliance on Section 102.112 is mistaken.

**4.** The cases cited by Respondent are ones in which courts have allowed exceptions to be filed later than the regulations seemed to permit; but, these cases are not controlling. In *Kessler Institute for Rehabilitation v. NLRB*, 669 F.2d 138 (3d Cir.1982) the court interpreted how the three-day enlargement time for filing exceptions is calculated. In *NLRB v. Washington Star Co.*, 732 F.2d 974 (D.C.Cir.1984), exceptions were allowed to be accepted one day late where the Respondent made a good faith effort to comply, the delay was considered *"de minimis"* and did not result in prejudice to the other party. The case law suggests that allowances for late filing may be made in situations where there are exceptional circumstances or where the Board acts negligently. Neither of these factors is present. Also, at no time after receiving the decision and order did the Condominium move for an extension of time in which to file its motion for reconsideration. *See generally* Section 102.48(d)(2) (1985). Consequently, the exceptions filed by the Respondent were untimely; and the Board acted properly in declining to consider them.

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (*en banc*), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

**6.** The relevant portions of section 152 are as follows:
(6) The term "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.
(7) The term "affecting commerce" means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce. 29 U.S.C. secs. 152(6), (7) (1984).

NLRB's jurisdiction as defined in 29 U.S.C. sec. 160(a) (1984).[7]

When the National Labor Relation Act was passed, Congress intended to grant the Board, pursuant to the Commerce Clause, the broadest possible jurisdiction permitted by the Constitution. *See NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963). Still, the Board has discretion to decline to exercise its authority and has established standards to confine its jurisdiction. Congress expressly approved this policy in the Landrum-Griffin Act of 1959, 29 U.S.C. sec. 164(c)(1) (1984). The Board has set the jurisdictional standard for housing cooperatives and condominiums at $500,000.00 in gross annual revenues. *See 30 Sutton Place Corp.*, 240 NLRB No. 94, 100 LRRM 1335 (1979). This policy is founded on the belief that "cooperatives and condominiums are engaged in the business of concerted home management and maintenance.... that [have] a substantial impact on interstate commerce." *Id.* at 753, 100 LRRM at 1336.

■ The Respondent asserts that because it produces no articles or commodities, it cannot "affect commerce" and therefore the Board could not properly assert jurisdiction over the Condominium. Such a contention is, however, contrary to a long line of precedent that does not limit congressional authority under the Commerce Clause exclusively to situations involving production and manufacturing of goods which flow in interstate commerce.[8] *See, e.g., Heart of Atlanta Motel v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). The fact that an employer does or does not manufacture goods is not the beginning nor is it the ending point for determining whether the Board's jurisdiction under the Act is proper.

■ Nor does the noncommercial nature of the Condominium help the Condominium's case. For example, recently the Board has determined that day care centers, private colleges, residential apartments, and nonprofit fund raising operations for charitable organizations are subject to the Board's jurisdictional mandate. *See generally Salt & Pepper Nursery School & Kindergarten No. 2*, 222 NLRB No. 202, 91 LRRM 1338 (1976) (day care center); *Cornell University*, 183 NLRB No. 41, 74 LRRM 1269 (1970) (private college); *In the Matter of David Landau*, 280 NLRB No. 155, 123 LRRM 1001 (1986) (residential apartments); *American Lebanese Syrian Associated Charities, Inc.*, 277 NLRB No. 189, 121 LRRM 1286 (1986) (nonprofit fund raising operation for charitable organizations). The jurisdictional basis for these decisions derives, not from these entities' involvement in traditional commercial activities, but, instead, from the substantial impact the entities have upon interstate commerce. *See, e.g., NLRB v. St. Louis Christian Home*, 663 F.2d 60 (8th Cir.1981).

Because Imperial House Condominiums, Inc., similarly, has a substantial impact upon interstate commerce, the Board can properly exercise its jurisdiction in this particular instance. As noted in *30 Sutton Place*,

[t]oday's cooperatives and condominiums are involved in commercial activity on a large scale. Although they may vary in size and in the types of services offered to occupants, many provide amenities such as reception and answering services, 24–hour security and valet services, laundry and storage space, covered parking areas, medical facilities and day care centers, swimming pools, tennis courts,

---

7. Subsection (a) provides in part:
   (a) The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice affecting commerce. 29 U.S.C. sec. 160(a) (1984).

8. Under current interpretations of the Commerce Clause, the scope of congressional power is expansive. *See, e.g., Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (local restaurant subject to federal control because it purchased $70,000.00 of meat from local supplier who, in turn, purchased it from another state); *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (wheat farmer subject to federal control even though wheat grown was for farmer's own consumption because the total demand for wheat on interstate market diminishes if all farmers grow and consume their own wheat).

golf courses, saunas, playgrounds, and function and recreation rooms. Thus a typical enterprise may hire more than a score of employees who perform a variety of functions. For these employees, the cooperative or condominium must meet a payroll which may include tax, insurance, and workmen's compensation payments. The enterprise will also typically purchase maintenance supplies and energy for heating and cooling, and make payments covering mortgage costs, sewage and water fees, and real estate taxes.... All these activities indicate that cooperatives and condominiums are engaged in the business of concerted home management and maintenance. Furthermore, this business impacts on interstate commerce for it is dependent upon the free flow of supplies and labor and in this sense necessarily involves other institutions which operate in interstate commerce.

240 NLRB at 753, 100 LRRM at 1335.

■ Consistent with *30 Sutton Place*, Imperial House Condominium, Inc. "impacts on interstate commerce." As noted, the Condominium employed approximately forty employees, who provided a host of services including housekeeping, maintenance, and parking services. The payroll related expenditures including salaries, wages, social security and other expenses were in excess of $345,000.00. Moreover, Imperial House Condominium, Inc. transacted a substantial amount of business with various enterprises which, as the parties stipulated, were engaged in interstate commerce. In combination, these factors support the Board's conclusion that the Condominium affected commerce for purposes of establishing jurisdiction under the Act.

■ In addition, we reject the Condominium's contention that employees involved in housekeeping activities are exempt from the Act's coverage by virtue of Section 2(3) which excludes from the definition of "employee" anyone employed "in the domestic service of any family or person at his home." *See Ankh Services, Inc.*, 243 NLRB No. 68, 101 LRRM 1419 (1979). It is clear that the Condominium's housekeepers are not employed by the unit owners in whose home the housekeepers provide their services. Although the housekeepers do render services to the unit owners, they nevertheless perform these services on behalf of and are clearly employed by the Condominium, a Florida corporation. This conclusion is also supported by factors mentioned in *30 Sutton Place Corp.*, 240 NLRB No. 94, 100 LRRM 1335 (1979), where the Board commented that Sec. 2(3) would not preclude its assumption of jurisdiction. The Board said,

there is a substantial difference between employment by a single homeowner and employment by a cooperative or condominium entity. In the first instance, an individual and personal relationship is created between the homeowner and the employee; in the second instance, the employee's relationship with the employer, the cooperative or condominium entity, is no different from that of an employee performing similar work for an apartment house or office building.

*Id.* at 753 n. 6, 100 LRRM at 1336 n. 6. Thus, both *Ankh* and *30 Sutton Place* reflect an accurate characterization of the true economic relationship existing between the employers and employees. Such a relationship is present in this case.

"Because of the Board's 'special competence' in the field of labor relations, its interpretation of the Act is accorded substantial deference." *Pattern Makers' League of North America v. NLRB*, 473 U.S. 95, 100, 105 S.Ct. 3064, 3068, 87 L.Ed.2d 68 (1985). Therefore, "[t]he extent to which the Board chooses to exercise its jurisdiction is a matter of administrative policy within the Board's discretion; and in the absence of extraordinary circumstances whether jurisdiction should be exercised is for the Board, not the courts, to determine." *NLRB v. WGOK, Inc.*, 384 F.2d 500, 502 (5th Cir.1967). *See also NLRB v. Highview, Inc.*, 590 F.2d 174, 178 (5th Cir. 1979). There being no extraordinary circumstances in the instant case, we cannot say the Board's discretion was improperly exercised.

## III. *The Board's Findings Are Supported by Substantial Evidence*

Having concluded the Board's order is final and that the NLRB's jurisdiction was proper, we must now determine whether the Board's finding of an unfair labor practice is supported by substantial evidence. Such a finding must be upheld if it is based upon substantial evidence contained in the record taken as a whole, and based upon reasonable inferences drawn from the facts as found. Furthermore, the remedy chosen by the Board must "be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969). The Board is charged with the responsibility for ensuring that the Act's underlying goal of industrial peace is achieved,[9] a responsibility which the Board could not effectively discharge if the Board did not receive our respect for its judgment.

Nevertheless, this court is an independent appellate court and does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy and has chosen a remedy that effectuates the purposes of the Act. *Ona Corp. v. NLRB,* 729 F.2d 713, 719 (11th Cir.1984) (citing *NLRB v. Brown,* 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)).

In the instant case, the Board adopted the ALJ's conclusions that the Condominium violated Section 8(a)(5) and (1) of the Act by ceasing contributions to the HEIF and unilaterally instituting a new employee health benefit fund that provided greater benefits. The Condominium, however, defends by arguing that the Union's August 14, 1980, letter relieved the Condominium of its obligation to bargain with the Union over the decision to implement a new plan. The Board concluded that "the Union's letter contained elements of both a bargaining proposal and a direction to the Respondent to change its contribution practice." *Imperial House Condominium, Inc.,* 279 NLRB No. 154, 122 LRRM 1289 (1986). In view of the Union's letter, the Board also noted that lawful and reasonable alternatives were at the Condominium's disposal. For example, the Condominium "could have acted lawfully ... by continuing its contributions to the old fund, by agreeing to contribute to the new fund, or by negotiating with the Union regarding the proposed change."

---

**9.** The congressional declaration of purpose in Section 1(b) of the Act, provides:

Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.

It is the purpose and policy of this Act, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and prescribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.

29 U.S.C. sec. 141(b) (1984). Section 7 originally protected only the right to unionize but was amended when the Taft–Hartley Act was passed in 1947 expressly to protect employee's right not to engage in collective activity. It provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).

29 U.S.C. sec. 157 (1984).

 Nothing in the letter authorized the Condominium to start its own health benefit fund. Indeed, Section 8(a)(5) of the Act, 29 U.S.C. sec. 158(a)(5) required the Condominium to bargain with the Union before unilaterally changing an existing contractually established term and condition of employment. This obligation is unaltered by the fact that the collective bargaining agreement between the Condominium and the Union had expired. *See Electric Machinery Co. v. NLRB*, 653 F.2d 958, 963–64 (5th Cir.1981) (employer violated Act when, following expiration of CBA, it unilaterally instituted company hospitalization plan over a Union plan); *Clear Pines Moulding*, 283 NLRB No. 13, 99 LRRM 122 (1978) (same). Because the Condominium ceased making payments to the HEIF and unilaterally implemented a new plan without bargaining with the Union, actions which constitute a clear violation of Sections 8(a)(5) and 8(a)(1), the Board's determination that the Condominium committed an unfair labor practice is supported by substantial evidence.

Also, the Condominium contends that its refusal to bargain concerning health benefits, was justified because of the Condominium's good faith doubt with respect to whether the Union truly represented the majority of employees in the bargaining unit. Ordinarily, even though a collective bargaining agreement has expired, an incumbent union enjoys a presumption of majority status; but this presumption is rebuttable. *NLRB v. Newspapers, Inc.*, 515 F.2d 334, 340 (5th Cir.1975). To rebut this presumption, the Condominium points to disparaging statements made by former union members, the resignation of union officials, and the apparent lack of zeal with which the Union pursued contract negotiations during the year preceding the Condominium's refusal to bargain.

 Determining whether an employer entertains a good faith doubt of a union's majority status is a question of fact. *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293 (9th Cir.1978), *cert. denied*, 444 U.S. 887, 100 S.Ct. 187, 62 L.Ed.2d 122 (1979). Given the limited scope of our review concerning factual issues, and in light of the record before us, we cannot say that the NLRB erred in deciding that the Condominium left the presumption unrebutted and in deciding that the Condominium lacked a good faith doubt.

## CONCLUSION

To summarize, we conclude that the Board's decision and order is final and that the Board properly exercised its jurisdiction. Moreover, substantial evidence supports the Board's finding that Imperial House Condominiums, Inc. engaged in an unfair labor practice. Therefore, enforcement is GRANTED.