[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10618
Non-Argument Calendar
_____

Agency Nos. 10-CA-088599; 10-CA-093022


TAFT COAL SALES & ASSOCIATES, INC.,
WALTER ENERGY, INC., and
WALTER MINERALS, INC.,

Petitioners/Cross-Respondents,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner.

_____

Petitions for Review of a Decision of the
National Labor Relations Board
_____

(October 2, 2014)

Before WILSON, ROSENBAUM and DUBINA, Circuit Judges.

PER CURIAM:

This case involves a petition for review and cross-application for enforcement of an order of the National Labor Relations Board. *See Taft Coal Sales & Ass'n*, 360 N.L.R.B. No. 19, 198 L.R.R.M. (BNA) 1181 (Jan. 10, 2014). After a complete review of the record, we deny the petition for review and grant the application for enforcement.

Petitioners Taft Coal Sales & Associates, Inc., Walter Energy, Inc., and Walter Materials, Inc. raise three issues for review. Two relate to the factual findings of the Board: (1) Petitioners constitute a single employer, and (2) Petitioners violated section 8(a)(5) of the National Labor Relations Act by failing to bargain in good faith with the United Mine Workers of America, District 20 (the Union) about a layoff and its effects. The third concerns the propriety of the Board's remedy: reinstatement and back pay for the laid-off employees. We address each issue in turn.

**I.**

Petitioners first challenge the Board's finding that they constitute a single employer.

We review the Board's factual findings to ensure that they are supported by substantial evidence given the totality of the record. 18 U.S.C. § 160(e); *NLRB v. U.S. Postal Serv.*, 529 F.3d 729, 732 (11th Cir. 2008). Substantial evidence means more than a scintilla. *NLRB v. Contemporary Cars, Inc.*, 667 F.3d 1364, 1370

2

(11th Cir. 2012).  It means enough "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quoting *Bickerstaff Clay Prods. Co. v. NLRB*, 871 F.2d 980, 984 (11th Cir. 1989)) (internal quotation mark omitted).  Where the Board draws plausible inferences from the record, "we will not overturn its determinations, even if we would have made different findings upon a *de novo* review of the evidence."  *Cooper/T. Smith, Inc. v. NLRB*, 117 F.3d 1259, 1261 (11th Cir. 1999).  Nevertheless, "the Board cannot ignore relevant evidence that detracts from its findings because such evasion detracts from a finding of substantial evidence."  *NLRB v. Triple A Fire Prot., Inc.*, 136 F.3d 727, 734 (11th Cir. 1998).

To determine whether nominally separate employing entities constitute a single employer, the Board considers four factors: "(1) common ownership, (2) common management, (3) interrelation of operations, and (4) common control of labor relations."  *Kings Fire Prot., Inc.*, 358 N.L.R.B. No. 156, 194 L.R.R.M. (BNA) 1455 (Sept. 27, 2012); *see also Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999) (en banc) (recognizing the four factors of the so-called "NLRB test" for single-employer status).  Because no factor is controlling and all need not be present, single-employer status turns on case-specific facts and "is characterized as an absence of an 'arm's length relationship found among unintegrated companies.'"  *Int'l Bhd. of Elec. Workers, Local 613 v. Fowler Indus.,*

3

*Inc.*, 884 F.2d 551, 553 n.3 (11th Cir. 1989) (quoting *NLRB v. Don Burgess Constr. Corp.*, 596 F.2d 378, 384 (9th Cir. 1979)).

## A.

Petitioners concede common ownership. Their companies have a familial relationship. Walter Energy is the parent company of Walter Materials, a wholly owned subsidiary. Taft Coal in turn is a wholly owned subsidiary of Walter Materials—the grandsubsidary of Walter Energy. The issues here center on a layoff of 21 employees at Taft Coal's surface-mining operation—the Choctaw Mine—in Walker County, Alabama.

## B.

Petitioners challenge the Board's finding of common management. In their view, this finding is supported only by the corporate summary sheets—joint exhibits submitted during the hearing before the administrative law judge solely for corporate identity and jurisdictional purposes. But whatever their purpose, these exhibits were part of the record before the Board. And given that Petitioners share a significant number of common directors and officers, we will not disturb the Board's plausible inference of common management.

4

## C.

Petitioners contend that the evidence on the third factor—interrelation of operations—overwhelmingly establishes that the day-to-day operations of Walter Energy, Walter Materials, and Taft Coal are independent. To be sure, the record lacks substantial evidence of interrelated operations. But this is consistent with the Board's finding that "although Taft [Coal] and Walter Energy share common addresses, each maintains separate bank account and financial records, and, with the exception of labor relations, . . . *are essentially run independently*." *Taft Coal Sales*, 360 N.L.R.B. No. 19 at 5 (emphasis added).

At bottom, Petitioners disagree with the weight given to this factor. The Board decided that it "neither strongly supplements, nor greatly detracts from" a finding of single-employer status. Petitioners contend that it weighs heavily against such a finding. Because we conclude that the Board's finding of common control of labor relations is supported by substantial evidence, we need not focus further on this factor, which is neither controlling nor required. *See Fowler Indus.*, 884 F.2d at 553 n.3; *accord Mercy Hosp. of Buffalo*, 336 N.L.R.B. 1282, 1284 (2001) ("A single employer relationship will be found only if one of the entities exercises actual or active control over the day-to-day operations or labor relations of the other.").

5

**D.**

Petitioners also challenge the Board's finding that Walter Energy and Walter Materials exercise common control over Taft Coal's labor relations. To support its finding, the Board focused on the labor-relations activities of three employees:

- Walter Scheller, Walter Energy's chief executive officer and co-director (with Robert Kerley, Walter Energy's vice president, corporate controller and chief accounting officer) of both Walter Materials and Taft Coal;

- Thomas Lynch, Walter Energy's senior vice president of human resources; and

- Steve Dickerson, Walter Materials' head of human resources, who handles human-resources and labor-relations issues for Taft Coal; Dickerson reports to and receives his performance reviews from Lynch at Walter Energy.

*See Taft Coal Sales*, 360 N.L.R.B. No. 19 at 5.

The Board's finding is supported by substantial evidence. To begin, Walter Materials controls labor relations at Taft Coal. Petitioners emphasize Dickerson's testimony was that Taft Coal sets its own labor-relations and human-resources policy and makes day-to-day decisions in these areas without Walter Energy's involvement. Indeed, Dickerson testified about his role as director of human resources for Taft Coal and his involvement in Taft Coal's labor-relations issues. Petitioners, however, ignore that Dickerson works for Walter Materials, not Taft Coal. His testimony is thus substantial evidence in support of the Board's finding that Walter Materials exercises common control over Taft Coal's labor relations.

6

Turning to Walter Energy, we conclude that substantial evidence exists that it exercises common control over Taft Coal's labor relations through Scheller and Lynch, especially for the labor-relations issue at stake here: the layoff of 21 employees at Taft Coal's Choctaw Mine.  Our discussion of each executive's involvement begins with Scheller.

Following the Choctaw Mine layoff, the Union's chief representative, Daryl Dewberry, called Scheller to discuss the Union's issues with the layoff.  Instead of informing Dewberry that the Union's layoff-related concerns should be addressed to someone at Taft Coal or Dickerson at Walter Materials, Scheller referred these issues to Walter Energy's senior vice president of human resources, Lynch.[1]

Lynch's layoff-related actions were significant.  He notified the Union about the Choctaw Mine layoff—not one of Taft Coal's officers or Dickerson, Walter Materials' head of human resources who handles human resources for Taft Coal.

---

[1] During his June 27 call to Scheller, Dewberry also discussed an allegation that a Taft Coal supervisor had threatened closure of the Choctaw Mine if the Union's organizing efforts were successful.  As Petitioners note, Scheller was the proper party for Dewberry to contact about this given the neutrality agreement between Walter Energy and the Union.  Scheller's response to the supervisor's alleged misconduct was unequivocal:  if it happened, he would fire the supervisor. *Taft Coal Sales*, 360 N.L.R.B. No. 19 at 4.  That the CEO of a publicly traded, multinational corporation would personally fire a mine supervisor at Taft Coal, a grandsubsidary of Walter Energy, suggests Scheller's involvement with labor relations at Taft Coal.

Additionally, Walter Energy's obligations under the neutrality agreement do not include resolving the Union's issues with the June 27 layoff at the Choctaw Mine.  Scheller, in his capacity as Walter Energy's CEO, could have declined to entertain or address the Union's layoff-related issues and directed Dewberry to contact someone at Taft Coal or Dickerson at Walter Materials.  But he did not.

7

In his layoff notice, Lynch explained that affected employees would be offered a chance to join Walter Energy's Canadian mining operation. He (and Dickerson) met with the Union after the layoff to discuss how Taft Coal decided which employees to lay off. Finally, he monitors Dickerson's labor-relations activities and provides his yearly performance review.

Unlike with Walter Materials, the evidence of Walter Energy's common control over Taft Coal's labor relations is not overwhelming, but it is enough to satisfy highly deferential substantial-evidence standard of review. Put differently, Walter Energy's control over Taft Coal's labor relations is supported by more than a scintilla of evidence. We thus leave the Board's finding on this factor in place.

## II.

Petitioners next challenge the Board's finding that they violated section 8(a)(5) of the Act.[2] Here, too, our review is limited to ensuring that this finding is

---

[2] In their reply brief, Petitioners posit that we must first wrestle with whether a so-called "economic layoff" is a mandatory bargaining issue under section 8(d) of the Act. Petitioners did not raise or even mention this issue in the portion of their opening brief on the section 8(a)(5) violation. They do however summarily conclude that decision bargaining was not required in one paragraph on page three of their six-page challenge to the Board's remedy. This buried, conclusory reference is not enough to preserve Petitioners' right to present an argument on this issue in their reply brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–83 (11th Cir. 2014) (discussion various ways issue can be waived on appeal). Accordingly, we decline to consider this issue here. *See Starship Enters. of Atlanta v. Coweta County, Ga.*, 708 F.3d 1243, 1254 (11th Cir. 2013) ("We do not consider the argument because Starship failed to present the argument in its opening brief. That it raised it in its reply brief will not suffice.").

supported by substantial evidence given the whole record.  18 U.S.C. § 160(e);

*U.S. Postal Serv.*, 529 F.3d at 732.

The events leading up to the layoff that underlies Petitioners' section 8(a)(5)

violation are largely undisputed.  In early June, Alabama Power, a major coal

purchaser, notified Taft Coal that it would reduce its future purchases in light of

cheaper fuel alternatives.  On June 21, Taft Coal amended Alabama Power's coal

purchasing agreement to account for the company's decreased demand.  As a

result, coal production at the Choctaw Mine was expected to drop by 125,000 tons

during the second half of 2012.  Given the projected decline in production, Taft

Coal decided to eliminate 21 positions at the mine effective June 27.

On June 25, Lynch notified the Union about Alabama Power's decision to

significantly scale back its coal purchases.  After outlining the change in

circumstances, Lynch announced that 21 Choctaw Mine employees would be laid

off on June 27 and explained that the affected employees would be notified the

following week about Walter Energy's continuing need for experienced surface

miners in Canada.  To be precise, he declared:

> this week we will be announcing workforce reductions at the
> [Choctaw Mine].  A total of 21 represented positions will be
> eliminated, and [affected] employees . . . will be notified
> on . . . June 27.  Walter Energy continues to have opportunities
> for experienced surface miners in Northeast British Columbia,
> and we are planning to . . . discuss these openings the week
> following notification.

9

> Please let me know if you have any questions or would like
> to discuss these actions in greater detail.

*Taft Coal Sales*, 360 N.L.R.B. No. 19 at 3.

The next day, Dewberry called Dickerson at Walter Materials. After confirming the substance of Lynch's letter, Dewberry asked for a list of affected employees. And after the affected employees were notified the following day, he received the list from Dickerson.

Given these facts, the Board found that there had been a unilateral layoff. Specifically, the Board concluded that

> the Union was presented with a *fait accompli*, which precluded meaningful pre-implementation bargaining. [Petitioners] unilaterally decided to conduct the layoff, identified who would be laid off, and determined what transfer opportunities would be allocated to affected miners, without offering the Union any opportunity to bargain over these matters. . . . Such unilateral action was unlawful.

*Id.* at 6.

The Board's finding is supported by substantial evidence. The Union learned about the planned layoff and the transfer opportunities that would be offered to affected miners in the same paragraph of Lynch's June 25 letter—just two days before the layoff. Lynch's language is as clear as it is certain. He tells the Union that

- "we *will be announcing* workforce reductions" this week;

- "21 represented positions *will be eliminated*";

10

- affected "employees . . . *will be notified* on . . . June 27"; and

- "we *are planning to* . . . discuss [Walter Energy's continuing opportunities for experienced surface miners in Northeast British Columbia] the week following notification."

*Id.* at 3 (emphasis added).  Additionally, the Union did not receive the list of affected employees until after the layoff.

Ignoring the operative language of Lynch's letter, and to prove that the layoff was not a *fait accompli*, Petitioners lean heavily on the letter's closing: "Please let me know if you have any questions or would like to discuss these actions in greater detail."  Treating this as genuine invitation rather than a perfunctory closing, Petitioners point out that the Union neither asked to delay the layoff nor pursued any bargaining about the layoff procedure;[3] instead, the Union merely requested a list of affected employees and the chance to discuss the layoff after reviewing the list.  Both requests, as Petitioners note, were honored. Petitioners thus conclude that they clearly neither failed nor refused to bargain with the Union.

Yet even if Lynch's final line can withstand the strain that Petitioners place on it, this does not negate the other evidence of a *fait accompli*.  And we must uphold the Board's finding even where reasonable Board members or jurists,

---

[3] Dickerson testified that Taft Coal was prepared to negotiate or delay the layoff had the Union made such a request.

11

viewing the evidence in the first instance, could reach different conclusions. *See Contemporary Cars*, 667 F.3d at 1370. At best, the evidence Petitioners marshal calls into question whether the layoff was a *fait accompli*. But this evidence—which did not evade the Board's review—does not render the conclusion that the layoff was a *fait accompli* one that no reasonable person could draw. As a result, we leave the Board's finding undisturbed.

Also, by presenting the Union with a *fait accompli*, Petitioners cannot now argue that they timely gave notice or that the Union waived its right to decisional bargaining by not demanding that the parties engage in a charade. *See NLRB v. Crystal Springs Shirt Corp.*, 637 F.2d 399, 402 (5th Cir. Unit A Feb. 1981) ("Notice of a *fait accompli* is simply not the sort of timely notice upon which the waiver defense is predicated." (quoting *Int'l Ladies Garment Workers Union v. NLRB*, 463 F.2d 907, 919 (D.C. Cir. 1972)) (internal quotation mark omitted)).

## III.

Lastly, Petitioners challenge the Board's order requiring reinstatement and backpay for the laid-off employees.

Section 10(c) of the Act grants the Board broad remedial power to address unfair labor practices, including requiring the "reinstatement of employees with or without back pay." 29 U.S.C. § 160(c). "Because of its special expertise, the Board is afforded broad discretion in formulating remedies that will further the

12

purposes of the Act." *Mead Corp. v. NLRB*, 697 F.2d 1013, 1022 (11th Cir. 1983).

For this reason, "the remedy chosen by the Board must be 'given special respect by

reviewing courts.'" *NLRB v. Imperial House Condo., Inc.*, 831 F.2d 999, 1006

(11th Cir. 1987) (alteration omitted) (quoting *NLRB v. Gissel Packing Co.*, 395

U.S. 575, 612 n.32, 89 S. Ct. 1918, 1939 n.32 (1969)).  Indeed, because our review

"is very limited," *Mead Corp.*, 697 F.2d at 1022, the Board's remedial order will

be enforced "unless it can be shown that the order is a patent attempt to achieve

ends other than those which can fairly be said to effectuate the policies of the Act,"

*Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S. Ct. 398, 406

(quoting *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S. Ct. 1214, 1218

(1943)).

Here, the Board found that Petitioners violated section 8(a)(5) of the Act by

"fail[ing] to bargain in good faith with the Union about *both* the decision to lay off

unit employees and its effects." *Taft Coal Sales*, 360 N.L.R.B. No. 19 at 1 n.2.

Given these findings, which we leave in effect, the Board's remedial order—

requiring reinstatement and full back pay—is common.  *See Plastonics, Inc.*, 312

NLRB 1045, 1045 (1993) ("The traditional and appropriate Board remedy for an

unlawful unilateral layoff based on legitimate economic concerns includes

requiring the payment of full backpay, plus interest, for the duration of the

layoff."); *see also Adair Standish Corp.*, 292 N.L.R.B. 890, 890 n.1 (1989).  Under

13

these circumstances and our limited review, we cannot say that the Board abused its considerable remedial authority in this case.

PETITION FOR REVIEW DENIED; CROSS-APPLICATION FOR ENFORCEMENT GRANTED.