U.S. MOSAIC TILE CO., INC., Williams Tile & Terrazzo Co., Inc., Petitioners, Cross–Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TILE, TERRAZZO & MARBLE CON-TRACTOR ASSOCIATION OF ATLAN-TA & VICINITY and Williams Tile Company, Respondents.

Nos. 90–8617, 90–8757.

United States Court of Appeals, Eleventh Circuit.

July 17, 1991.

George K. McPherson, Jr. and Robert N. Godfrey, Smith, Currie & Hancock, Atlanta, Ga., for appellant.

McNeill Stokes, Frankel, Hardwick, Tanenbaum & Fink, P.C., Atlanta, Ga., for Williams Tile & Terrazo Co.

Frank B. Shuster, Blackburn, Shuster, King & King, Atlanta, Ga., for Tile, et al.

Aileen A. Armstrong and William M. Bernstein, Washington, D.C., for N.L.R.B.

Before KRAVITCH and CLARK, Circuit Judges, and GODBOLD, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

This case arrives on our bench after the National Labor Relations Board ("Board") determined that certain construction industry employers had violated various fair bargaining provisions of the National Labor Relations Act ("Act"). The employers asked the Board to reconsider its decision, and the Board refused on the ground that the motion to reconsider raised an affirmative defense which properly should have been presented at an earlier stage of the proceedings. The employers petition that

we review the Board's decision and the Board seeks enforcement. We hold that the Board acted within its discretion in determining that the employers failed to timely present their defense under section 8(f) of the Act, and that the Board properly determined that the employers violated the Act.

## I

Petitioners Williams Tile & Terrazzo Co. and U.S. Mosaic Tile Co. (hereinafter "Williams" and "Mosaic" individually, "Employers" collectively) operate tile, terrazzo, marble and slate installation businesses. In 1983 the two companies formed the Tile Terrazzo & Marble Contractors Association of Atlanta & Vicinity (the "Association") which joins the petitioners in this action. Williams and Mosaic are the exclusive members of the Association. In 1983 the Association entered into a two-year collective bargaining agreement with Tile, Marble & Terrazzo Finishers and Shopmen, Local 167 (the "Union"); the agreement covered the period from October 1983 through September 1985. Prior to this agreement the Union had represented the employees of the companies for approximately seventeen years. The Association considered the Union to be the collective bargaining representative for all the employees involved in the tile construction work within the Union's jurisdiction.

In August 1985 the Union and the Association began bargaining for a new agreement. Although they held several bargaining sessions, the then current agreement expired on September 30 without the parties achieving a succeeding agreement. On November 12 the Association presented its final offer. That offer included a pay rate of $9.00 per hour, which was a reduction from the $10.59 rate under the prior agreement. The Union rejected the offer and negotiations ended. On November 19 the Union employees began a strike; the administrative law judge ("ALJ") later found the action to constitute an economic strike spawned by the wage issue. At some point during the last week of November, the Association terminated its contributions to the employees' fringe benefits fund. These contributions had been required by the expired contract, and the Association had not proposed terminating them during any of the negotiations. At the beginning of that final week in November, on Monday the 24th, approximately fifty-five of the employees returned to work. The various parties sharply contest the total number of employees who were considered within the "unit" of the Union from which the Association members could hire; the ALJ found the number to be over 100.

On December 20 the Union business manager, James Clowers, sent a letter to the chairman of the Association, Kenneth Williams, and a copy to Mosaic's Vice President Thrower. In this letter Clowers stated that the remaining employees were making an unconditional offer to return to work and to accept the $9.00 per hour pay rate. He also noted that the final agreement had to be ratified by the Union. The evidence regarding receipt of and responses to this letter was a source of much debate before the ALJ: Clowers stated that on December 27 Thrower informed him that the offer seemed satisfactory but that he had to consult Williams; Thrower disputed this, testifying that he never said the offer was acceptable and in fact he believed the offer was not unconditional because the Union had to ratify the agreement. Williams testified that he had not read the letter as of January 3 when Clowers reached him by telephone. When Williams spoke with Clowers on January 3, he told Clowers that he doubted that the Union had a majority of the employees under its control. Williams stated that this belief was partially a result of the fact that some employees had signed decertification petitions expressing their rejection of the Union.

After failing to receive an official response from the Association regarding the Union's offer, the Union sent another letter on January 28 informing the Association that the November settlement offer had been accepted as a contract by the Union members. Mosaic and Williams did in fact rehire several of the striking employees during January, February and March, but

twelve of the strikers were not reinstated. The ALJ found that both companies hired other employees in lieu of reinstating the twelve strikers.

The Union eventually sought redress through the Board. On February 26 it filed charges against the Association alleging a refusal to bargain in good faith, a violation of section 8(a)(5) of the Act.[1] On June 5 the Union also alleged that the Employers violated section 8(a)(3) by discriminatorily refusing to rehire and delaying in rehiring certain employee-strikers, and on June 25 it filed charges that the Association improperly stopped contributing to the fringe benefit funds in violation of section 8(a)(5). This latter charge was dropped on July 28; but at that time the former charges were amended to include the fringe benefit fund allegation. The Regional Director of the Board then consolidated these charges into a complaint on July 31. Hearings were held before the

ALJ that September, and the ALJ issued his opinion on March 27, 1987. The ALJ concluded that the Association and Employers had violated the various provisions of the Act. The parties filed their exceptions and responses to the ALJ's report with the Board in May, and the Board affirmed the conclusions of the ALJ in December of 1987.

In January 1988 the Employers filed a motion with the Board for reconsideration, arguing, for the first time, that a recent opinion issued by the Board affected the case. The Employers urged the Board to reconsider its position in light of *John Deklewa & Sons*, 282 N.L.R.B. 1375 (1987), *enf'd sub nom. Int'l Assn. of Bridge, Structural and Ornamental Iron Workers Local No. 3 v. NLRB*, 843 F.2d 770 (3rd Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988), in which the Board changed its interpretation of section 8(f) of the Act.[2] The Employers argued

1. Sections 8–10 of the Act are codified at 29 U.S.C. §§ 158–60.

2. Section 8(f) of the Act provides an exception to other bargaining provisions of the Act for the construction industry. Generally, a collective bargaining representative (union) outside the construction industry must be designated or selected by a majority of the employees in a given unit before that representative can have the exclusive right to represent the employees in bargaining with the employer. Once a representative achieves this status under § 9(a), it receives various bargaining protections provided by § 8(a) and (b) of the Act. The union also receives a presumption of majority status for a reasonable time, including during the period immediately after the end of a prior agreement when the parties are bargaining for a new contract; the employer must have a reasonable, good faith belief that the union has lost its majority in order to withdraw recognition of the union after the agreement ends. *See Iron Workers*, 843 F.2d 770, 772. Congress, recognizing the uniquely fluctuant nature of the construction industry, enacted § 8(f), which enables a representative of employees in the construction industry to enter a collective bargaining agreement with an employer without first having achieved majority status. The agreements are known as pre-hire agreements. The 1983–85 agreement involved in the present case was a pre-hire agreement.

Prior to *Deklewa* the Board interpreted § 8(f) to permit either party to terminate the bargaining agreement at will, so long as the union had not achieved majority status. *R.J. Smith Con-*

*struction*, 191 N.L.R.B. 693, *enf. denied sub nom. Operating Engineers Local 150 v. NLRB*, 480 F.2d 1186 (D.C.Cir.1973). The Board also determined, however, that if the union achieved majority status during the period of the agreement, it would receive the same protections as a § 9(a) union, including the presumption of majority status upon the expiration of the bargaining agreement. The Supreme Court later approved this interpretation as reasonable, though not necessarily the only one possible. *NLRB v. Local 103, Int'l Ass'n of Bridge and Ornamental Iron Workers (Hidgon Construction Co.)*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978).

Subsequent litigation naturally produced a complicated, fact-specific framework for determining when a union achieved majority status during the term of the pre-hire agreement. The Board, realizing the confusion and difficulty created by its own interpretation, decided to overhaul its view of § 8(f) agreements. Thus, in *Deklewa*, the Board decided that pre-hire agreements were no longer terminable at will, but were valid for the entire term. Additionally, the Board stated that the union would no longer receive the presumption of majority status upon expiration of the agreement, and thus would not retain the right to exclusive bargaining at that point. The union could, however, achieve majority status though the traditional methods for becoming a § 9(a) representative: Board certified election or voluntary recognition by the employer. 843 F.2d at 778. The Board also stated that the new interpretation, because it implemented the policies of the Act far better than the old rule, would apply retroactively to all pending cases.

that, under *Deklewa*'s new interpretation of section 8(f), the Union was not entitled to the presumption of majority status after expiration of the 1983–85 agreement. The Board denied the motion, asserting that the Employers were presenting an untimely affirmative defense under section 8(f) of the Act. Because *Deklewa* had been issued on February 20, 1987, the Board held that the Association should have pled any defenses based on that case prior to the Board's Final Order. The Employers then petitioned that we reverse the Board's Order, and the NLRB asked that we enforce that Order.

## II

The parties present a bountiful bag of issues, including the applicability of *Deklewa* and an analysis of the facts under both pre-*Deklewa* and post-*Deklewa* law. Before we consider the full range of these issues we must determine whether the Board properly denied the Employers' attempt to argue *Deklewa*.

In their motion for reconsideration, petitioners asserted that the actions which were found to constitute a violation of the Act were permissible under the interpretation of the Act espoused in *Deklewa*. Because neither the Board nor the ALJ considered *Deklewa* in their decisions, argued the Employers, reconsideration was necessary. After a response by the Board's general counsel and a reply by the Employers, the Board denied the motion with the following statement:

> We deny the Motion for Reconsideration because the Respondents [Employers] seek to raise a defense that is now untimely. The Respondents contend in their motion that this proceeding is now governed by the principles of Section 8(f)

We are in the unique position of having to confront the Board's affirmative defense position before this circuit has considered the *Deklewa* rule itself. Several circuits have now approved of *Deklewa*, often relying on the reasoning used by the Third Circuit when it enforced *Deklewa* in *International Assoc. of Iron Workers v. NLRB*, 843 F.2d 770 (3rd Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988). *See C.E.K. Indus. Mechanical Contractors v. NLRB*, 921 F.2d 350 (1st Cir.1990); *NLRB*

of the Act as set forth under *Deklewa*. Such a defense, however, was not raised by the Respondents in their exception to the decision of the administrative law judge.[3] In their exceptions and supporting brief, the Respondents failed to assert the existence of any issue under Section 8(f). Further, the Respondents did not refer to *Deklewa*, even though *Deklewa* had issued on February 20, 1987, prior to the administrative law judge's decision of March 25, 1987 in this proceeding.[4] Moreover, *Deklewa* already had issued over two months prior to the Respondent's (sic) filing of its (sic) exceptions and brief on May 4, 1987. Further, during the pendency of this case before the Board, between the filing of the exceptions and the issuance of the Decision and Order on December 17, 1987, the Respondents did not attempt to assert the existence of any issues under Section 8(f). Indeed, the Respondents found it appropriate to assert the defense now raised only *after* the issuance of an unfavorable Decision and Order affirming the judge's findings that the Respondents violated the Act. In these circumstances there are no "extraordinary circumstances" within the meaning of Section 102.48(d)(1) of the Board's Rules and Regulations which would justify granting the Respondents' motion.

---

[3] Because this proceeding was not pending before the Board on exceptions arguably raising an 8(f) issue when the decision in *Deklewa* issued, it is distinguishable from *Ron E. Savoia Construction Co.*, 289 NLRB No. 26 (June 17, 1988). See also *Yorkaire, Inc.* 297 NLRB No. 58 (Nov. 30, 1989) and *Howard Electrical and Mechanical, Inc.*, 293 NLRB No. 51 (Mar. 29, 1989)....

[4] In their brief in support of exceptions, Respondents contended that at the time they withdrew recognition from the Union, there were

*v. Bufco Corp.*, 899 F.2d 608 (7th Cir.1990); *NLRB v. W.L. Miller Co.*, 871 F.2d 745 (8th Cir.1989); *Mesa Verde Construction Co. v. Northern California Counsel of Laborers*, 861 F.2d 1124 (9th Cir.1988) (en banc). The Supreme Court denied *certiorari* in *Deklewa*, and has not otherwise addressed the issue. Because we hold that the Board correctly refused to hear the *Deklewa* defense, we cannot now speak to the viability of *Deklewa* in our circuit.

.. 

sufficient objective considerations to conclude that the Union "no longer represented a majority of their employees" and "had lost its majority support." The Respondents did not contend that the bargaining relationship entered into was 8(f) in character until the filing of their Motion for Reconsideration.

■ In order to comprehend fully our role as an enforcing court in this situation, we must consider the proper deference to be granted the NLRB. Generally, the Board's decisions on whether to grant motions for reconsideration are, like other procedural determinations, within its discretion. *See NLRB v. Seafarers Int'l Union,* 496 F.2d 1363 (5th Cir.1974);[3] *see also, e.g., NLRB v. H.M. Patterson & Son,* 636 F.2d 1014, 1018 (5th Cir. Unit B Feb. 1981) (Board's alleged procedural errors reviewed for an abuse of discretion). Section 10(d) of the Act provides that the Board has the discretion to determine and apply its rules for modification of opinions: "Until the record in a case shall have been filed in a court ... the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it." 29 U.S.C. § 160(d).

Statements regarding the general deference applied to motions for reconsideration, however, do not resolve the question of deference in this case. As discussed below, the Board's decision rested on both procedural determinations and an implicit statutory interpretation. We grant deference to both procedural and interpretive decisions by an agency; our deference to these two types of decisions, however, stems from different principles which require somewhat distinct analyses. As stated above, deference to the agency procedural interpretations is based primarily on congressional requirements expressed through section 10(d) of the Act.[4] Deference to an agency's substantive interpretation of the statute it enforces, on the other hand, is founded on Supreme Court precedent, particularly *Chevron, U.S.A. v. Natural Resources Defense Counsel,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its progeny. With these contours of deference in mind, we can better understand our task of reviewing the Board's decision.

■ The question of whether the Board correctly denied the motion divides into several issues. Initially we must determine whether the Board's characterization of the application of *Deklewa* as an affirmative defense, which is a question of statutory interpretation, was proper.[5] If it was not proper, then we must determine whether the Board's failure to apply *Deklewa* amounted to arbitrary and capricious action. If the issue was correctly determined to be a defense, however, then we must decide whether the Board abused its discre-

---

**3.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**4.** As Professor Davis has keenly observed, "[a] theory that the courts may not specify what procedure agencies should use except when the courts are either interpreting due process or a particular statute could be a reasonable one. But it is not the law." K. Davis, *Administrative Law Treatise* (1980), § 14.10. The question of whether a court should grant deference to agency procedural determinations in the absence of due process issues and statutory requirements currently ferments in the federal courts, *see id.,* but fortunately in this case Congress explicitly has required deference on the issue of modifications of agency opinions.

**5.** The Board, in its brief, urges that the failure of the Employers to present the *Deklewa* issue at the proper time precludes us from considering the issue at this stage, citing *Corson and Gruman Co. v. NLRB,* 899 F.2d 47, 49–50 (D.C. Cir.1990). This misconstrues *Corson* and the posture of the present case. In *Corson* the employer had not presented the *Deklewa* argument to the Board at any stage. Section 10(e) of the Act provides that "[n]o objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Thus the D.C. Circuit determined that section 10(e) barred it from considering the argument. The court did observe, however, that had the employer raised the argument before the Board at any one of several occasions, including by motion for reconsideration, the issue might have been preserved for appellate court consideration. 899 F.2d at 49–50. Because Mosaic did raise the *Deklewa* argument in the reconsideration motion to the Board, our consideration is not precluded by § 10(e).

tion by concluding, as a procedural matter, that the defense was untimely.

The Board, unfortunately, did little to explain why *Deklewa* was an affirmative defense in this case. The order denying the motion for reconsideration simply asserted that the Association had failed to present this issue as a defense, and then proceeded to discuss why the defense was not timely. The Board's statement that the issue was an affirmative defense focused not on *Deklewa* itself, but on section 8(f) of the Act. We interpret this to mean that the Board viewed the Association's argument as arising under section 8(f), that it considered Employers' assertion of section 8(f) to be an affirmative defense, and that it believed that *Deklewa* constitutes law to be argued under that section only when the issue of a section 8(f) contract is properly before the Board.

■ The question of whether to label certain issues raised under section 8(f) as defenses is one of statutory interpretation. As such, we are guided by *Chevron, U.S.A. v. Natural Resources Defense Counsel,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), in which the Court established the principles of statutory construction and deference to agency interpretations. If Congress has spoken to the issue with which we are concerned, there is no need for deference. If Congress has not addressed the issue, the court defers to the agency if its interpretation is reasonable,

that is, if it is not arbitrary, capricious, or clearly contrary to law. *Chevron,* 104 S.Ct. at 2781–83; *Lipscomb v. United States,* 906 F.2d 545, 548 (11th Cir.1990).[6]

■ Turning to the statute, we observe that the second tier of *Chevron* governs our review. The statute permits employers and unions in the construction industry to enter bargaining agreements prior to hiring employees and prior to the establishment of the union's majority status; the statute is silent, however, on whether the assertion of rights under this section can be considered an affirmative defense within the agency's proceedings. Given congressional silence, we defer to the Board's interpretation that the Employers' assertion of a section 8(f) contract and consequent *Deklewa* rights constituted an affirmative defense unless that interpretation is unreasonable.

The petitioners argue that the Board's characterization of their section 8(f) argument as a defense is unreasonable because it does not square with prior Board statements regarding *Deklewa* and section 8(f).[7] In *Deklewa* the Board did not pass on the question of affirmative defenses, but rather formulated a new interpretation of section 8(f) and asserted that it would apply retroactively. Indeed, to the extent that the Board in the present case interpreted *Deklewa* to be simply a statutory interpretation under section 8(f), language in *Deklewa* supports the position: the "principles

---

6. Although the agency action in *Chevron* involved a legislative regulation, the deference standards set forth in that case are now applied to most agency actions, including administrative adjudications such as those by the NLRB. *See* K. Davis, *Administrative Law Treatise* (1989 Supp.) § 29:16–7; *see also, Chemical Mfrs. Ass'n. v. Natural Resources Defense Council,* 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985) (applying *Chevron* to Environmental Protection Agency's case-by-case variance determinations as well as its regulations); *Hammontree v. NLRB,* 925 F.2d 1486, 1491 (D.C.Cir.1991) (applying the *Chevron* analysis to an NLRB adjudicative determination). As Justice Scalia recently scribed, "[i]n an era when our treatment of agency positions is governed by *Chevron,* the 'legislative rules v. other action' dichotomy ... is an anachronism." *EEOC v. Arabian American Oil Co.,* —— U.S. ——, 111 S.Ct. 1227, 1236, 113 L.Ed.2d 274 (1991) (Scalia, J. concurring).

7. The Supreme Court has given some indication that agency inconsistency on a position reduces the deference to which it is entitled under the second tier of *Chevron. See I.N.S. v. Cardoza Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987). In *Cardoza Fonseca,* however, the Court determined that it was interpreting the explicit language of the statute and not an implicit gap, and thus was applying the first, nondeferential tier of *Chevron. Id.* 480 U.S. at 446–49, 107 S.Ct. at 1221–22. We believe that we need not speculate on how this passing discussion of agency inconsistence affects the *Chevron* analysis, because agency inconsistency is easily encompassed in the analysis of whether the agency action is arbitrary and capricious. Indeed, agency inconsistency on a matter of statutory interpretation, if not well articulated, would almost epitomize arbitrary agency action.

we advance today provide an overall framework for the interpretation and application of Section 8(f)...." *Deklewa,* 282 N.L.R.B. 1375, 1385. Furthermore, in its discussion of retroactivity, the *Deklewa* Board stated that "the Board is doing nothing more than holding parties to the terms and conditions of 8(f) contracts...." *Id.* at 1389. In *Deklewa* the section 8(f) issues were central to the case as presented to the Board initially, and the Board simply applied its new interpretation of section 8(f) agreements; the Board did not have occasion to determine the procedural nature of section 8(f) issues.

It can be argued that *Deklewa*'s pronouncement of retroactivity is inherently inconsistent with the Board's current position that the Employers were asserting section 8(f) as an affirmative defense. Indeed, petitioners assert that although the Board had the discretion to establish the new rule in *Deklewa,* it affirmatively limited its own future discretion by stating that the rule should apply retroactively to all pending cases. In other words, petitioners claim that the Board abused its discretion by not adhering to its own implied limitation of discretion.

This position, however, misinterprets decisions of the Board and the distinction between retroactivity and affirmative defenses. As we stated, the Board in *Deklewa* did not determine whether section 8(f) was an affirmative defense, but only that it applied retroactively to pending cases. It is not inconsistent with *Deklewa* for the Board now to assert that certain section 8(f) issues arising after *Deklewa* are defenses which can be lost by failure to plead or argue. Although such a decision may result in a more limited retroactive effect of *Deklewa* than would be the case otherwise, it does not prevent retroactive application in cases where the possible existence of a section 8(f) contract is properly raised by a party under the procedures estab-

lished by the Board or otherwise before the Board.[8]

The argument that the Board has been unreasonably inconsistent is not limited to a comparison with *Deklewa;* it may also be possible that the Board's more recent applications of *Deklewa* implicitly reject the possibility that a section 8(f) argument under *Deklewa* is an affirmative defense rather than an issue of statutory interpretation for the Board to raise *sua sponte.* As the Board itself recognized, its decision in *Ron E. Savoia Construction Co.,* 289 N.L.R.B. No. 26 (June 17, 1988) could be construed to express a policy that *Deklewa* issues require *sua sponte* consideration by the Board. In *Savoia,* also a case involving a construction industry pre-hire agreement, the ALJ issued his decision a month prior to *Deklewa* and the parties' exceptions to the ALJ's decision were filed two weeks before *Deklewa.* The Board later, *sua sponte,* remanded the case to the ALJ so that he could apply and the parties could argue *Deklewa.*

Although an initial reading of *Savoia* might indicate some contradiction with the Board's present failure to consider *Deklewa sua sponte,* two factors demonstrate that the Board acted within its discretion. First, in *Savoia* the employers arguably had anticipated *Deklewa* and thus raised a section 8(f) defense in their exceptions. The Board stated that, although the Employers' exception did not mention section 8(f) explicitly, it did assert that Savoia never recognized the union as a bargaining representative and would not do so unless the union were certified. 289 N.L.R.B. No. 26. The Board construed this statement as raising potential section 8(f) arguments similar to the interpretation of section 8(f) agreements in *Deklewa*—that upon termination of pre-hire agreements the union loses its bargaining status unless recognized or certified. Therefore, as the employer had anticipated *Deklewa* and raised

---

**8.** Although it is possible that in some cases the Board should apply § 8(f) absent a § 8(f) argument by either party, the facts of this case do not warrant such a conclusion. Both the Employers and the Board originally considered this case to be governed by § 9(a). This dispute could reasonably be seen as a § 9(a) dispute, and we do not read the facts to indicate that the Board was compelled to recognize the possible application of § 8(f). It was therefore up to the parties to raise § 8(f) in this case.

the issue of a section 8(f) contract, it should have the opportunity to argue *Deklewa*. Second, the employer in *Savoia* had not had the opportunity to present an argument to the Board based on *Deklewa* because the decision issued after the employer filed its exceptions with the Board. Under that unique circumstance, the employer had no opportunity to argue fully the section 8(f) affirmative defenses.

In the present situation the Board takes the position that *Savoia* and this case are quite different: the Employers' exceptions to the ALJ report did not contain even a colorable section 8(f) argument, and their exceptions were filed well after *Deklewa*.[9] This position of the Board is entirely consistent with its determination that the Employers' assertion of section 8(f) issues in this case constituted an affirmative defense, and, as such, should have been presented at the first feasible stage after *Deklewa* issued. The Board will only allow exceptions for special circumstances such as those in *Savoia*, where there was a colorable section 8(f) claim present in the exceptions to the ALJ report and where more precise presentation was not possible because *Deklewa* had not issued. Given that the Board's decisions can reasonably be interpreted as consistently viewing *Deklewa* issues to be affirmative defenses,[10] we cannot say that the Board abused its discretion in so holding here.

■ Having determined that the Board did not abuse its discretion in holding that *Deklewa* issues are affirmative defenses, we next consider whether its failure to consider an affirmative defense for the

first time on a motion to reconsider constitutes an abuse of discretion. This question is far simpler. Congress explicitly provided the Board with the power to determine its own reasons and procedures for reconsidering its decisions. 29 U.S.C. § 160(d). Petitioners do not raise any due process claims with regard to the Board's decision not to consider affirmative defenses when not raised prior to a final order; in fact, their argument regarding the motion for reconsideration rests almost entirely on the proposition that *Deklewa* is not an affirmative defense. We find it entirely reasonable for the Board to require parties to present all their arguments in their exceptions to the ALJ's report, unless the Board finds exceptional circumstances. This rule avoids the sandbagging effect of one party waiting to see if a decision is favorable and then, if it is not, raising new arguments. The rule therefore promotes the agency's fair and efficient administration of the Act, and we cannot say that the Board's application of this rule in this case constituted an abuse of discretion.

### III

Next we turn to the Board's substantive determination that the Employers violated the Act. The Board, adopting the ALJ's report, determined that the Employers violated section 8(a)(3) of the Act by failing to rehire economic strikers and violated section 8(a)(5) by 1) terminating contributions to the employees' fringe benefit fund, and 2) refusing to recognize and bargain with the Union. The Board then ordered, *inter alia*, that the Employers 1) reinstate the

9. Indeed, the Employers failed to take exception with the ALJ's statement that the employees constituted "a unit appropriate for collective bargaining within the meaning of Section 9(a) of the Act." Had the Employers wanted to alert the Board to the possibility that this case should have been analyzed under section 8(f), they should not have left uncontested such references to section 9(a); the Employers silence here created the implied assumption that they believed that section 9(a), and not section 8(f), controlled. See supra note 8.

10. By presenting the Board's decision in *Savoia*, we have purposely discussed the agency's consistency with regard to the one case which could

arguably have been inconsistent. We note that the agency has on other occasions specifically held that § 8(f) arguments presented after *Deklewa* were untimely raised. *See Yorkaire, Inc.,* 297 N.L.R.B. No. 58 (failure to argue *Deklewa* at the ALJ hearing which was held after *Deklewa* had issued barred party from raising it before the Board); *Howard Electrical and Mechanical, Inc.,* 293 N.L.R.B. No. 51 n. 5 (failure of party to argue *Deklewa* in exceptions to ALJ report and after *Deklewa* issued barred the Board from considering the issue). These decisions emphasize the Board's consistent characterization of § 8(f) issues arising after *Deklewa* as affirmative defenses.

strikers they had failed to rehire, 2) make whole all strikers they failed to rehire after January 3, including both the strikers they did not rehire and the strikers they rehired only after some delay, 3) make whole the fringe benefit fund according to the terms of the former bargaining agreement, and 4) recognize the Union as the representative of the employees and bargain with it upon request. We review the Board's decision to see that, considering the entire record, it is supported by substantial evidence. 29 U.S.C. § 160(e); *Bickerstaff Clay Products Co. v. NLRB*, 871 F.2d 980, 984 (11th Cir. 1989).

### Refusal to Bargain

■■■ Generally, when a collective bargaining agreement expires the union retains the presumption of majority status.[11] *NLRB v. Imperial House Condominium*, 831 F.2d 999, 1007 (11th Cir.1987). An employer need not recognize the union, however, if 1) the union has in fact lost its majority status, or 2) the employer has a good faith doubt, based on objective evidence, that majority status has been lost. *NLRB v. Curtin Matheson Scientifics, Inc.*, —— U.S. ——, 110 S.Ct. 1542, 1549–50, 108 L.Ed.2d 801 (1990). There is no dispute about the fact that the Employers withdrew recognition from the Union on January 3 when Williams told the Union representative that he believed the Union had lost majority status. Nor is there any issue before us regarding whether the Union in fact had lost majority status. The sole issue presented to us by petitioners regarding the refusal to bargain is simply whether the Board incorrectly ignored the totality of the evidence supporting the Employers' good faith belief that majority status had been lost. To support this good faith belief, the Employers point to the following evidence: 1) a majority of the strikers returned to work within days after the strike; 2) the Employers received peti-tions signed by forty-three employees expressing dissatisfaction with the Union at the beginning of January; and 3) the Employers had heard verbal statements of dissatisfaction from employees.

This circuit has held that an employee's returning to work during a strike does not itself reflect a rejection of the union. *Bickerstaff*, 871 F.2d at 988. Strikers returning to work can only support a good faith belief of lost majority when combined with other evidence. *Id.* As supporting evidence the Employers cited the petitions signed by employees which rejected the Union. The ALJ found, however, that the Employers' reliance on these petitions betrayed the lack of a good faith belief, because the Employers did not receive all the petitions until after the nonrecognition on January 3. We hold that there was sufficient evidence to support the Board's adoption of the ALJ's conclusions. The relevant bargaining unit for the purpose of majority status was the multi-employer unit of over 100 employees, and the petitions received by the Employers as of January 3 listed only twenty-eight names. The Employers' attempts, after the fact, to support their actions with petitions which they had not received provides further evidence to support the Board's conclusion that the Employers were not relying in good faith on those petitions. Finally, the Board also correctly concluded that oral statements by some employees which were referred to as "rumblings through the shop" by Williams, could not support a good faith belief that the Union had lost majority status. *See United Supermarkets, Inc. v. NLRB*, 862 F.2d 549, 554 (5th Cir.1989) (vague assertions insufficient to support a good faith belief). These factors, even when combined, are insufficient to support the conclusion that the Employers had a good faith belief that majority status was lost. The Board correctly rejected such a de-

---

11. In analyzing the facts and issue in this case the Board assumed that the bargaining agreement and union-employer actions were governed by section 9(a) of the Act because the arguments presented to the Board by the parties were framed in that manner. Because we hold that the Board did not abuse its discretion by refusing to consider a belated affirmative defense asserting that section 8(f) should govern the case, and because this circuit has not yet established the *Deklewa* rule as the law of the circuit, we likewise operate under the view that section 9(a) principles control.

fense by the Employers, and correctly held that the Employers violated the Act by withdrawing recognition from the Union.

### Termination of Fringe Benefit Contributions

■■■■ The Employers' only contention before us regarding the fringe benefit funds is that the Union filed the fringe benefit charge with the Board outside the six-month period permitted for filing, and thus the allegation was barred. Section 10(b) of the Act prohibits the issuance of a complaint that is based on an alleged practice occurring more than six months prior to the charge. There is no question here that the separate charge regarding fringe benefits was filed on June 25, 1986, more than six months after the initial termination of contributions in November 1985. The Board held, however, that the original charge filed in February 1985 encompassed the fringe benefit allegation because it alleged violations of section 8(a)(5) of the Act caused not only by the refusal to bargain, but also by "other acts ... [which] interfered with, restrained, and coerced employees in the exercise of their rights guaranteed by Section 7 of the Act." The Board correctly held that the fringe benefit allegations fell under section 8(a)(5) and that the "other acts" language of the charge was sufficient to include the fringe benefit fund claims. Unfair labor practice charges are not construed as strictly as pleadings, and language such as that employed in the February charge has been found sufficient to include related acts. *NLRB v. Central Power and Light Co.*, 425 F.2d 1318, 1320 (5th Cir.1970). Thus the Board correctly accepted the July 1986 amendment of the February complaint, and the fringe benefit charge was not barred by section 10(b).

### Reinstatement of Striking Employees

■■■■ The Employers argue first that the offer to return to work received from the Union in December 1985 was not unconditional. Whereas economic strikers are entitled to reinstatement upon their unconditional offer to return to work, *Georgia Craft Co. v. NLRB*, 696 F.2d 931, 938 (11th Cir.1983), a conditional offer to return will not produce such an entitle-

ment. *Swearingen Aviation Corp. v. NLRB*, 568 F.2d 458, 463 (5th Cir.1978). The Employers allege that the Union conditioned the offer to return to work on the ratification of the contract by Union members. The letter sent to the Employers stated that "all employees make an unconditional offer to return to work" but it also mentioned that the contract offer was awaiting ratification by the employees. The Board accepted the ALJ's findings that oral statements by Union official Clowers further supported the assertion that the Union was making an unconditional offer to return to work; the statement regarding the ratification was not a condition, but a statement of fact. The employees were going to return to work prior to the ratification and, presumably, would work whether or not the Employers' final offer was eventually ratified. There is substantial evidence to support this conclusion by the Board.

■■■■ The Employers also contend that their obligation to rehire the strikers was excused because they had hired permanent replacements. Although it is true that the hiring of permanent replacements will excuse the obligation to rehire strikers, *see Hanson Bros. Enter.*, 279 N.L.R.B. No. 98 (1986), there is sufficient evidence to support the Board's conclusion that the Employers did not consider the replacement workers to be permanent. Officials for both Williams and Mosaic testified that they did not pay much attention to the replacements and that the replacements were hired in order to complete the jobs then underway. The ALJ's extensive findings supported the conclusion that the Employers did not consider the replacement workers to be permanent, and we therefore uphold the Board's determination that the Employers violated the Act by failing to rehire and delaying in the rehiring of certain strikers.

For the foregoing reasons, the Board's Order is

ENFORCED.